# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| SERGIO DIAZ and RETHA CONNORS, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>FORD MOTOR COMPANY,<br><br>Defendant | Case No.<br><br>Jury Trial Demanded |

## CLASS ACTION COMPLAINT AND
## DEMAND FOR JURY TRIAL

T<small>ABLE OF</small> C<small>ONTENTS</small>

INTRODUCTION ................................................................................... 1

JURISDICTION AND VENUE........................................................... 6

PARTIES ............................................................................................... 7

A. Plaintiffs .........................................................................................7

B. Defendant .....................................................................................11

SUBSTANTIVE ALLEGATIONS ................................................. 11

A. Ford markets its vehicles as safe, dependable, and "Built
   Ford Tough" .................................................................................11

B. The Bushing Defect poses a serious safety risk to millions of
   drivers, passengers, and bystanders. .........................................16

C. Ford knew or should have known of the Bushing Defect
   before it disclosed the defect to Plaintiffs and other Class
   members. ......................................................................................21

   1. Ford Conducts Extensive Pre-Sale Durability Testing of
      the Class   Vehicles......................................................... 19

   2. Ford had knowledge of the Defect from warranty claims
      and other customer complaints ................................... 21

   3. Beginning in 2018, Ford has issued a series of rolling
      recalls due to the Bushing Defect ............................... 39

D. Ford still does not offer Class members a *bona fide* remedy
   for the Bushing Defect, and leaves drivers with dangerous
   vehicles...........................................................................57

TOLLING OF STATUTES OF LIMITATIONS ........................... 61

A. Discovery Rule ...........................................................................62

B. Fraudulent Concealment ...........................................................63

C. Estoppel .......................................................................................64

ii

CLASS ALLEGATIONS ................................................................... 65

CAUSES OF ACTION ................................................................... 69

VIOLATION OF THE MAGNUSON-MOSS WARRANTY
ACT ................................................................................................... 57

FRAUDULENT CONCEALMENT ................................................ 61

UNJUST ENRICHMENT ............................................................... 64

BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (UCC § 2-314) ........................................ 65

VIOLATIONS OF THE DECEPTIVE ACTS AND
PRACTICES STATUTE .................................................................. 67

BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (N.Y. U.C.C. LAW §§2-314 AND 2-
A-212) ............................................................................................... 70

VIOLATIONS OF THE MISSOURI MERCHANDISING
PRACTICES ACT ("MMPA") ...................................................... 73

BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (MO. REV. STAT. § 400.2-314) ............ 74

REQUEST FOR RELIEF ............................................................... 94

DEMAND FOR JURY TRIAL ...................................................... 95

iii

Plaintiffs Sergio Diaz and Retha Connors ("Plaintiffs"), individually and on behalf of all those similarly situated, complain of Defendant Ford Motor Company ("Ford" or "Defendant"), based upon their personal knowledge as to facts specific to them and based upon the investigation of counsel in all other respects, as follows:

## INTRODUCTION

1.      An automobile purchase is one of the most expensive and important decisions consumers make. Consumers rely upon auto-makers' superior knowledge to manufacture and sell cars that are safe and free from defects. Ford markets itself as the "PIONEER[] [of] AUTO SAFETY" and readily admits that "safety is a crucial automotive attribute."[1] Should a manufacturer or distributor learn of any safety defects in its vehicles, it is imperative and a legal requirement for it to immediately warn the public and offer a *bona fide* remedy.

2.      Despite this critical mandate, Ford knowingly sold approximately 3 million Class Vehicles[2] containing a safety defect that creates a serious risk for unintended movement or rollaway crashes. Specifically, each Class Vehicle is

---

[1] **Exhibit 1**, https://corporate.ford.com/articles/history/ford-pioneers-auto-safety.html (last accessed Dec. 21, 2022).

[2] The Class Vehicles are 2013-2019 Ford Escape, 2013-2016 Ford Fusion, 2013-2018 Ford C-Max, 2013-2021 Ford Transit Connect, and 2015-2018 Ford Edge vehicles. Plaintiffs reserve the right to modify or amend their definition of Class Vehicles to include additional Ford vehicles with the same inherent defect.

equipped with defective shift cable bushings – the component that connects a vehicle's transmission and gear shift – that detach and degrade over time, resulting in unintended vehicle movement such as rollaways (the "Bushing Defect" or "Defect").[3] Unintended movement or rollaways endanger Ford drivers, passengers, and bystanders by placing them at risk of catastrophic crashes that could result in life-threatening injury, damage to Class Vehicles, or damage to nearby people or property.

3.     Ford was aware of the Defect long before it ever acknowledged its existence. Ford is experienced (and touts itself as such) in the design and manufacture of consumer vehicles and conducts durability tests on all of its components, including shift cable bushings, to verify that the parts are free from defects and comply with their specifications.  Ford also has access to numerous sources of information concerning the Class Vehicles and the Bushing Defect, including its own records of customer complaints, warranty claims, dealership repair records, and National Highway Traffic Safety Administration ("NHTSA") complaints.

---

[3] **Exhibit 2**, https://static.nhtsa.gov/odi/rcl/2018/RCLRPT-18V471-1223.PDF (last accessed Dec. 21, 2022).

4.      The specific cable bushings found in the Class Vehicles are Hilex (Hytrel 4556) Shift Bushings (the "Defective Bushings"). Ford admits that it received warranty claims related to the Defective Bushings and the Defect as early as April 2015, and at least 1,630 warranty claims were made as of March 31, 2022.

5.      In the face of a multitude of warranty claims and other complaints relating to the Defective Bushings, Ford waited years to issue safety recalls with NHTSA and continued to slow roll recalls for all Class Vehicles even after admitting that Hilex (Hytrel 4556) Shift Bushings result in the Bushing Defect.

6.      On July 16, 2018, Ford issued the first Defective Bushings recall of more than half a million 2013-2014 Ford Escape and 2013-2016 Ford Fusion vehicles. Ford stated that the vehicles contain a defect that results in the shifter cable bushing detaching from the transmission. Ford recognized that "[a] degraded shifter cable bushing that detaches from the transmission may allow the transmission to be in a gear state different than the gear shift position selected by the driver."[4] Ford noted that this "condition could allow the driver to move the shift lever to Park and remove the ignition key, while the transmission may not be in Park, with no warning message or audible chime."[5]

---

[4] *Id.*

[5] *Id.*

7.      Although the same Defective Bushings are installed in all Class Vehicles, Ford did not include all the Class Vehicles in its 2018 recall. Rather, Ford slow rolled its disclosure of the extent of the Defect. Since the first recall in July of 2018, Ford has issued four additional recalls for vehicles containing the Bushing Defect, including the most recent and largest recall in June of 2022, which encompasses more than 2.9 million vehicles.

8.      Ford knew that each of the 2.9 million Class Vehicles was equipped with the Defective Bushings and experienced elevated rates of failure, but the company waited years before disclosing the full extent of the Defect. Moreover, Ford continued to design, manufacture, and sell vehicles containing the Defective Bushings supplied by Hilex for years after it first became aware of the Defect.

9.      Ford admits that it has yet to determine the root cause of the Bushing Defect and that it "continues to investigate" the issue. After more than four years of recalls and investigations related to the deterioration of the Defective Bushings, Ford has yet to offer a *bona fide* remedy for the Defect—*i.e.*, one that addresses the dangerous deterioration of the Defective Bushings. Instead, Ford has offered to replace the bushings with new ones that are purportedly made of a new material and to install a cap over the bushings. But, as detailed below, Ford does not know whether the cap fixes the Bushing Defect, and, on information and belief, the

replacement bushings do not remedy the Bushing Defect. Indeed, owners have reported that the replacement bushings disintegrated within three years.[6]

10.     Finally, Ford acknowledges the existence of the Defect and the attendant safety risks, yet it tells Class members that they can continue driving the vehicle even if the putative remedy has not been installed. For their own vehicles, however, Ford instructs dealerships not to use any new Class Vehicle for demonstrations or to deliver them to customers until the Defect is fixed.

11.     Ford adds insult to injury by refusing to provide Class members with loaner vehicles or offer to reimburse drivers for rental vehicles while they wait for Ford to address the Bushing Defect.

12.     Ford has failed to provide a *bone fide* remedy for the Bushing Defect or offer Class Vehicle owners reimbursement for all out-of-pocket expenses, loss of use, and loss of value caused by the Defect.

13.     Ford's marketing of its vehicles as safe and reliable is pervasive across the United States, and practically unavoidable. What American does not know the slogan "Built Ford Tough"? Had Plaintiff and other Class members known of the

---

[6] *See* **Exhibit 3**, https://fordtransitconnectforum.com/topic/8243-safety-recall-18s20-%E2%80%93-shift-cable-bushing-replacement/ (last accessed Dec. 21, 2022).

Bushing Defect at the time of purchase or lease, they would not have bought or leased the Class Vehicles or they would have paid substantially less for them.

14.     As a result of Defendant's breaches of warranties, and unfair, deceptive, and/or fraudulent business practices, owners and/or lessees of the Class Vehicles, including Plaintiff, have suffered an ascertainable loss of money and/or property and/or loss in value. The unfair and deceptive trade practices committed by Defendant caused Plaintiff and the members of the Class damages, including but not limited to, loss of value, loss of use of the vehicles, and repair costs.

15.     Accordingly, Plaintiff brings this action to redress Defendant's misconduct. Plaintiff seeks damages and a repair under the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301-2312, state consumer protection act, state implied warranty act, and unjust enrichment at common law.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §§ 1332(d)(2) and (6), because: (a) there are 100 or more class members; (b) there is an aggregate amount in controversy exceeding $5,000,000.00 exclusive of interest and costs; and (c) there is minimal diversity because at least one Plaintiff and one defendant are citizens of different states. This Court also has federal question subject matter jurisdiction under 28 U.S.C. § 1331 because this case includes a claim under federal law (15 U.S.C. §

2301, et seq.). This Court also has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

17.     This Court has personal jurisdiction over Defendant by virtue of its transactions and business conducted in this judicial district. Defendant is headquartered in Michigan, has transacted and done business, and violated statutory and common law in the State of Michigan and in this District.

18.     Venue is proper in this judicial district under 28 U.S.C. § 1391 because Defendant transacts substantial business and is headquartered in this District. Defendant advertised in this District and received substantial revenue and profits from sales and/or leases of the Class Vehicles in this District. Therefore, a substantial part of the events and/or omissions giving rise to the claims occurred, in part, within this District.

## PARTIES

### A. Plaintiffs

#### 1.     Sergio Diaz

19.     Plaintiff Sergio Diaz is a citizen of New York and resides in Holbrook, New York. Plaintiff Diaz leased a new 2017 Ford Escape from Sayville Ford, an authorized Ford dealership located at 5686 Sunrise Hwy., Sayville, New York, in April 2017. Upon the expiration of his lease in April 2020, Plaintiff Diaz purchased the Class Vehicle from Sayville Ford. Sayville Ford is part of Ford's network of

authorized dealers across the United States. Ford promotes Sayville Ford on its website as an authorized Ford dealer.

20.    When shopping for his Class Vehicle, Plaintiff Diaz considered the reliability and quality of the make and manufacturer. Through his exposure and interaction with Ford, Plaintiff Diaz was aware of Ford's uniform and nationwide marketing message that its vehicles are safe and dependable, which was material to his decision to purchase his Class Vehicle. When he purchased the vehicle, he believed, based on Ford's marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff Diaz purchased his vehicle did Ford disclose to him that his vehicle was not safe or dependable, or that it suffered from the Bushing Defect, which creates safety risks.

21.    Plaintiff Diaz purchased his Class Vehicle with the Bushing Defect as part of a transaction in which Ford did not disclose material facts related to the automobile's essential purpose—safe and dependable transportation. Plaintiff Diaz did not receive the benefit of his bargain. He purchased a vehicle that is of a lesser standard, grade, and quality than represented, and he did not receive a vehicle that met ordinary and reasonable consumer expectations regarding safe and reliable operation. The Bushing Defect has significantly diminished the value of Plaintiff Diaz's Class Vehicle.

22.     Had Ford disclosed the Bushing Defect, Plaintiff Diaz would not have purchased his Class Vehicle, or would have paid less to do so.

23.     Plaintiff Diaz does not accept that the replacement Defective Bushings and remedies provided in Ford's recalls provide a *bona fide* fix for the Bushing Defect.

24.     Plaintiff Diaz would purchase another vehicle from Ford in the future if Defendant's representations about the vehicle, including its safety and durability, were accurate.

### 2.      Retha Connors

25.     Plaintiff Retha Connors is a citizen of Illinois and resides in Belleville, Illinois. Plaintiff Connors purchased a 2014 Ford Escape from Rock Road Auto Plaza located at 9440 Saint Charles Rock Rd., Saint Louis, MO 63114, on December 2, 2017.

26.     When shopping for her Class Vehicle, Plaintiff Connors considered the reliability and quality of the make and manufacturer. Through her exposure and interaction with Ford, Plaintiff Connors was aware of Ford's uniform and nationwide marketing message that its vehicles are safe and dependable, which was material to her decision to purchase her Class Vehicle. When she purchased the vehicle, she believed, based on Ford's marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and

dependable. At no point before Plaintiff Connors purchased her vehicle did Ford disclose to her that her vehicle was not safe or dependable, or that it suffered from the Bushing Defect, which creates safety risks.

27.    Plaintiff Connors purchased her Class Vehicle with the Bushing Defect as part of a transaction in which Ford did not disclose material facts related to the automobile's essential purpose—safe and dependable transportation. Plaintiff Connors did not receive the benefit of her bargain. She purchased a vehicle that is of a lesser standard, grade, and quality than represented, and she did not receive a vehicle that met ordinary and reasonable consumer expectations regarding safe and reliable operation. The Bushing Defect has significantly diminished the value of Plaintiff Connors's Class Vehicle.

28.    Had Ford disclosed the Bushing Defect, Plaintiff Connors would not have purchased her Class Vehicle, or would have paid less to do so.

29.    Plaintiff Connors does not accept that the replacement Defective Bushings and remedies provided in Ford's recalls provide a *bona fide* fix for the Bushing Defect.

30.    Plaintiff Connors would purchase another vehicle from Ford in the future if Defendant's representations about the vehicle, including its safety and durability, were accurate.

**B. Defendant**

31.    Defendant Ford Motor Company is a corporation organized and in existence under the laws of the State of Delaware and maintains its Corporate Headquarters at 1 American Road, Dearborn, Michigan 48126. Ford designs and manufactures motor vehicles, parts, and other products for sale in the United States and throughout the world. Ford Motor Company is the warrantor and distributor of the Class Vehicles.

32.    At all relevant times, Defendant was and is engaged in the business of designing, manufacturing, constructing, assembling, marketing, distributing, and/or selling automobiles and motor vehicle components throughout the United States.

## SUBSTANTIVE ALLEGATIONS[7]

**A. Ford markets its vehicles as safe, dependable, and "Built Ford Tough"**

33.    Founded by Henry Ford in 1903, Ford is one of the oldest and most distinguished automobile manufacturers across the globe. Ford is the second largest automaker in the U.S. and the fifth-largest in the world based on annual vehicle sales in 2010.

34.    Ford sells a wide variety of vehicle types and models, with everything from Super Duty pickup trucks to compact sedans. Regardless of make or model,

---

[7] Emphasis added throughout unless stated otherwise.

the Ford name maintains an unparalleled presence in the automotive industry and is widely considered to be the most iconic automaker in the world.

35.     For more than a century, Ford has touted the safety, durability, and quality of its vehicles. Indeed, nearly every American can repeat Ford's slogan: "Built Ford Tough."[8]

36.     Ford claims that "[o]ver the last century, [it] has designed vehicles with the customer at the center and manufactured safe, quality vehicles at high volumes to meet the needs of people all over the world."[9]

37.     For example, in July 2015, Ford released a promotional video titled "Quality is the Bedrock of Everything Ford Builds," in which it touts its advanced manufacturing technology and systems.[10]

---

[8] **Exhibit 4**, https://corporate.ford.com/about/culture/built-ford-tough.html (last accessed Dec. 22, 2022).

[9] **Exhibit 5**, Ford Safety Report, June 2021, available at https://media.ford.com/content/dam/fordmedia/North%20America/US/2021/06/17/ford-safety-report.pdf (last accessed Dec. 21, 2022).

[10] **Exhibit 6**, "QUALITY IS THE BEDROCK OF EVERYTHING FORD BUILDS," July 16, 2015, available at https://web.archive.org/web/20150911233057/https://media.ford.com/content/ford media/fna/us/en/asset.html/content/dam/fordmedia/North%20America/US/2015/03 /labor/mp4/quality-is-the-bedrock-of-everything-ford-builds.mp4.html (last accessed Dec. 21, 2022).

38.     In 2001, Ford introduced a compact SUV called the Escape. Since its launch, the Ford Escape has become an increasingly popular crossover-sized SUV. In 2018, the Ford Escape became Ford's best-selling vehicle outside of F-series pickup trucks. To date, Ford has sold well over 4 million Escapes in the United States—over 1.7 million of which suffer from the Bushing Defect.

39.     Ford marketed the 2014 Ford Escape as offering top of the line safety features, including "Advanced Safety Protection," which claimed to help the driver avoid a collision.[11] Specifically, Ford promoted the reliability of the advanced safety protection with the following description:

> The Ford Escape is equipped to help keep you out of harm's way. It has control features such as standard AdvanceTrac® with RSC® (Roll Stability Control™), featuring Curve Control - which will slow you down when it senses that you're going too fast for a particular curve - and traction control.[] The standard Tire Pressure Monitoring System alerts you when your tires are underinflated (not available on spare tire). To help protect you in a collision, Escape features the Personal Safety System,™ next-generation dual-stage driver and front-passenger airbags,[] a driver's knee airbag, and front seat-mounted side airbags. Escape also features the Safety Canopy® System with two-row side-curtain airbags.

---

[11] **Exhibit 7**, https://web.archive.org/web/20140207092411/http://www.ford.com/suvs/escape/features/#page=Feature11 (last accessed Dec. 22, 2022).

*Peace of mind. It's a standard feature in Escape*.[12]

40.    Ford's safety-based "peace of mind" marketing is pervasive throughout all Class Vehicles.

41.    For example, Ford's marketing for the 2013 Fusion offered promises of security, stating that "for peace of mind, the available Intelligent All-Wheel-Drive System gives you traction when and where you need it most."[13]

42.    In its brochure for the 2017 Edge, Ford advertises the vehicle as a way to "VENTURE OUT WITH CONFIDENCE," stating that "Edge helps you maintain your peace of mind with many standard safety features."[14]

43.    Ford-Transit Connect vehicles are passenger vans designed to carry more passengers than the average van, some seating up to fifteen passengers comfortably. Ford's marketing of the 2019 model touts that "Transit Passenger Vans are engineered to help you travel safely."[15]

-----

[12] **Exhibit 8**, https://web.archive.org/web/20140719000310/http://www.ford.com/suvs/escape/features/Feature11/ (last accessed Dec. 21, 2022).

[13] **Exhibit 9**, https://web.archive.org/web/20120409115606/http://www.ford.com/cars/fusion/2013/features/FeatureCategory1/ (last accessed Dec. 22, 2022).

[14] **Exhibit 10**, https://www.auto-brochures.com/makes/Ford/Edge/Ford_US%20Edge_2017.pdf (last accessed Dec. 21, 2022).

[15] **Exhibit 11**, https://www.auto-

44.     2017 Ford Transit Connect brochures offered representation touting the vehicle's safety, such as: "[s]afety takes priority with front and front-seat side airbags for the driver and front passenger, 3-point safety belts for every seat, and a Safety Canopy® System with side-curtain airbags for all seating rows – including the industry's first 5-row side-curtain airbag on 15-passenger models."[16]

45.     Contrary to Ford's pervasive safety-based marketing messages, the Bushing Defect renders Class Vehicles dangerous because Class members have no way to know if or when a Defective Bushing could cause unintended movement, such as a rollaway or collision.

46.     Unfortunately, the Bushing Defect directly counteracts any "peace of mind" assurances Ford offers because Plaintiffs and Class Vehicle drivers are left to operate their vehicles guessing if or when the Bushing Defect might cause unintended movement or rollaway collisions.

47.     While Ford currently promotes its dedication to quality, Ford has a checkered past when it comes to putting the safety of its customers first. Most notably, from 1971 to 1976, Ford marketed and sold over three million Pinto

---

brochures.com/makes/Ford/Transit/Ford_US%20Transit_2019.pdf (last accessed Dec. 21, 2022).

[16] **Exhibit 12**, https://www.auto-brochures.com/makes/Ford/Transit/Ford_US%20Transit+Connect_2017.pdf (last accessed Dec. 21, 2022).

vehicles, which had an undisclosed defect that resulted in deadly fuel tank fires. It would eventually come to light that Ford secretly crash-tested the Pinto more than forty times before it sold any of the vehicles and that the Pinto's fuel tank ruptured in every test performed at speeds over twenty-five miles per hour. Rather than installing solutions that would cost between $1 to $8 per vehicle, Ford decided to sell the vehicles without fixing the defect.

48.     As lawsuits began to pile up, Ford made the calculated decision that it would be more profitable to settle the lawsuits on an *ad hoc* basis than it would be to remedy the Pinto vehicles and potentially save lives. It is estimated that 500 to 900 burn deaths are attributable to Pinto crashes caused by the defect. Ford's handling of the Ford Pinto has now become a case study in tort law and business ethics. Sadly, as shown below, Ford has not learned much from the Pinto catastrophe.

**B. The Bushing Defect poses a serious safety risk to millions of drivers, passengers, and bystanders.**

49.     A transmission moves power from the engine to the wheels. A vehicle's engine produces power, but the transmission converts the engine power into torque, or rotational force, and transfers it to the axles in order to rotate the car's wheels.

50.     Each vehicle has gears that enable the engine to operate within a specific range as the vehicle accelerates, reaches a constant cruising speed, and

16

decelerates. The transmission allows for the range of vehicle acceleration and deceleration to change, effectively allowing the vehicle varying ranges of speed.

51.     All vehicles will have at least one shift cable that attaches the gears to the transmission. When the driver of a vehicle puts the car into Drive, Reverse, Neutral, or Park, the gearshift moves the shifter cable in order to engage the transmission.

52.     Car bushings are small, yet critical, components that are used when connecting two other parts.



*Hilex (Hytrel 4556) Shift Bushing*

53.     Relevant here, the Class Vehicles' Defective Bushings are located under the hood and are used to connect the shifter cable to the transmission.



*Ford's illustration of the shift cable (yellow) and the Defective Bushing (purple)[17]*



*A Class Vehicle shift cable shown with shift cable bushing in place[18]*

---

[17] **Exhibit 13**, https://static.nhtsa.gov/odi/rcl/2022/RCMN-22V413-4667.pdf (last accessed Dec. 21, 2022).

[18] *Id.*

54.     Over time, the Defective Bushings degrade and eventually detach from the shift cable.



*New Defective Bushing (left); Defective Bushing removed from a 2015 Ford Transit Connect after less than four years of use (right)[19]*

55.     The Defective Bushings put nearly 3 million Ford drivers, as well as countless bystanders, in grave danger, because, as Ford admits, a damaged or missing bushing could prevent the shifter from moving the transmission to the intended gear position.[20] For example, the transmission may not be in the park position, even though the shifter position indicates that the vehicle was shifted to park. This is particularly dangerous because a driver will not receive a warning

---

[19] **Exhibit 3**, https://fordtransitconnectforum.com/topic/8243-safety-recall-18s20-%E2%80%93-shift-cable-bushing-replacement/ (last accessed Dec. 21, 2022).

[20] **Exhibit 14**, https://static.nhtsa.gov/odi/rcl/2022/RCLRPT-22V413-2380.PDF (last accessed Dec. 21, 2022).

message or audible chime alerting him or her that the vehicle is not in the intended gear.

56.     According to Ford, "[e]xiting a vehicle without the transmission in the park position and without application of the parking brake may allow the vehicle to roll, increasing the risk of injury or crash."[21] This explanation dramatically understates the true danger the Bushing Defect poses, though.

57.     In a recently released NHTSA study of Non-Traffic Surveillance Data from 2016-2020, rollaways accounted for 17 percent of the total deaths in non-traffic crashes, with an average of 144 deaths per year.[22]

58.     On average, rollaway vehicles injured about 1,886 nonoccupants each year.[23] However, these statistics are likely an under-estimation because police data may not always capture incidents in parking lots or private driveways.[24]

---

[21] *Id.*

[22] **Exhibit 15**, https://crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/813363 (last accessed Dec. 21, 2022).

[23] *Id.*

[24] **Exhibit 16**, https://www.nbcdfw.com/news/nbc-5-responds/growing-calls-from-families-safety-advocates-to-address-vehicle-rollaway-risk/2700333/ (last accessed Dec. 21, 2022).

59.     In 2016, a similar problem with Jeep Grand Cherokee vehicles led to the death of actor Anton Yelchin in 2016. Yelchin exited his vehicle thinking it was in Park, when the Jeep began to roll down his driveway and pinned him to a brick post in front of his Los Angeles home.

60.     Rollaways also have the potential to damage the vehicle itself, as well as other vehicles, buildings, or nearby property as a result of unintended movement or rollaway of the vehicle.

61.     Unintended movement could also account for vehicle traffic crashes. For example, if a Class Vehicle driver put the car in park while waiting at a red light at a busy intersection but the shift cable failed to engage, a Class Vehicle could move into oncoming traffic at no fault of the driver.

62.     As a result, the Bushing Defect poses a great danger to nearly 3 million Class Vehicle drivers, who are unaware of the risk posed by their Ford vehicle, as well as to the general driving population who could be seriously injured as a result of rollaways or unintended movement.

### C. Ford knew or should have known of the Bushing Defect before it disclosed the defect to Plaintiffs and other Class members.

63.     Ford, based on the facts alleged herein and on information and belief, had full knowledge of the existence of the Bushing Defect and the risk it posed to Class Vehicle owners and lessees. This knowledge is based upon, among other facts: (a) Ford's pre-sale durability testing; (b) consumer complaints posted on the internet

and filed with NHTSA; (c) Ford dealership repair records and part sales; (d) Ford's post-sale defect investigations and recalls related to the Defective Bushings; and (e) warranty and post-warranty claims.

> **1.    Ford Conducts Extensive Pre-Sale Durability Testing of the Class Vehicles**

64.    Ford is experienced in the design and manufacture of consumer vehicles. As an experienced manufacturer, Ford conducts extensive tests, including pre-sale durability testing, on incoming components to verify the parts are free from defects and align with its specifications.

65.    Ford states that "[t]he definition of 'Built Ford Tough' is rooted in a series of grueling tests designed to ensure quality, durability and dependability."[25] Ford states that "[a]ll new Ford models are put through a tough testing and development process to ensure they not only offer class-leading levels of ride comfort for occupants but are easily capable of withstanding the loads placed upon components by damaged road surfaces."[26]

---

[25] **Exhibit 17**, https://www.blueovaltech.com/2009/2009-ford-f150-press-kit.pdf (last accessed Dec. 21, 2022).

[26] **Exhibit 18**, https://www.theautochannel.com/news/2011/03/30/525466.html (last accessed Dec. 21, 2022).

66.     Ford maintains a "comprehensive lineup of testing facilities around the world" at which it "puts vehicles through everything from the extreme, to the everyday, to ensure that only world-class vehicles roll off the production line."[27] Ford further states that its "vehicles and components are 'shaken, rattled and rolled' in a variety of tests, some conducted in temperatures ranging from an arctic minus 40 degrees Celsius, to desert-scorching heat of over 50 degrees Celsius."

67.     Ford acknowledges that "[d]ust and sand can also play havoc with engine internals and suspension components by accelerating wear on moving parts," and therefore, Ford "monitors sand and dust egress on the engine."[28] Ford also maintains "[h]ot and cold chambers… [to] test the functionality of things like the rear liftgate, the hood and electrical features such as the interior heater in temperatures ranging from a sweltering 49 degrees Celsius, to a bone-chillingly low minus 29 degrees."

68.     Ford also puts prototype and pre-production vehicles through its "Total Durability Cycle" test. The Total Durability Cycle is described by Ford as a "sped-up evaluation" that "runs around the clock, day and night, to simulate 10 years, or

---

[27] **Exhibit 19**, https://media.ford.com/content/fordmedia/img/me/en/news/2019/10/07/testing-in-the-extremes--how-fords-multiple-testing-facilities-p.html (last accessed Dec. 21, 2022).

[28] *Id*.

240,000km, of severe customer usage in just a few weeks."[29] The test features "[g]ravel roads, cobblestones, pot-holes, curbs and water baths.... [And] [j]ust for good measure, environmental factors like dust, water and mud are thrown in, while dynamometers simulate towing heavy loads in traffic and over mountain passes."

69.     In addition to the Total Durability Cycle, Ford engineers perform a "full Vehicle Corrosion Test, which runs for 12 weeks straight, 24 hours a day, seven days a week, so vehicles can withstand even the most humid, salty conditions a coastal life can bring."[30] The Vehicle Corrosion Test "[consists] of a controlled humidity soaking, followed by a shake-down over various road surfaces… expos[ing] the vehicle to salt, dust and gravel, all the while ambient temperatures and humidity levels drop and spring back like a yo-yo."[31]

70.     On information and belief, the Class Vehicles underwent such durability testing in order to ensure that its components, including the Defective

---

[29] *Id.*; *see also* **Exhibit 18**, https://www.theautochannel.com/news/2011/03/30/525466.html (last accessed Dec. 21, 2022).

[30] **Exhibit 19**, https://media.ford.com/content/fordmedia/img/me/en/news/2019/10/07/testing-in-the-extremes--how-fords-multiple-testing-facilities-p.html (last accessed Dec. 21, 2022).

[31] *Id.*

Bushings, could withstand various environments, whether heat or cold, over a period of time that meets or exceeds the vehicle's expected lifetime.

> **2.    Ford had knowledge of the Defect from warranty claims and other customer complaints**

71.    Ford has admitted that from April 29, 2015 through March 31, 2022, the company received at least 1,630 warranty reports and identified 233 vehicle owner questionnaires ("VQQs") filed with NHTSA attributed to the Bushing Defect in Class Vehicles.[32]

72.    On information and belief, Ford's customer relations department, which interacts with authorized service technicians in order to identify potentially widespread vehicle problems and assist in the diagnosis of vehicle issues, has received over a thousand reports of the Bushing Defect. Customer relations also collects and analyzes field data, including, but not limited to, repair requests made at dealerships and service centers, technical reports prepared by engineers that have reviewed vehicles for which warranty coverage is requested, parts sales reports, and warranty **claims** data.

---

[32] **Exhibit 14**, https://static.nhtsa.gov/odi/rcl/2022/RCLRPT-22V413-2380.PDF (last accessed Dec. 21, 2022).

73.     Ford's warranty department similarly reviews and analyzes warranty data submitted by its dealerships and authorized technicians in order to identify defect trends in its vehicles.

74.     Ford also regularly monitors NHTSA databases for consumer complaints as part of its ongoing obligation pursuant to the TREAD Act, 49 U.S.C. § 30118, to identify potential defects in its vehicles.

75.     Complaints submitted to NHTSA reveal a long history of reported bushing failures involving rollaways and unintended movement with Class Vehicles.

76.     Below are just a few example complaints filed with NHTSA related to the Defective Bushings, rollaway incidents, or unintended movement in Class Vehicles caused by the Defect:

- o 2014 Ford Escape
  - ▪ NHTSA ID No.: 10936353[33]
  - ▪ Filed December 19, 2016
  - ▪ Summary of Complaint:
  - ▪ THE CAR WAS STOPPED AND THEN PUT INTO 'REVERSE' WHERE IT SUCCESSFULLY REVERSED FROM A PARKING LOT ONTO A RESIDENTIAL STREET. WHEN PUT DIRECTLY INTO 'DRIVE' THE CAR CONTINUED TO REVERSE. **AT THIS POINT THE SHIFTER CONTROL CABLE BROKE AND/OR STOPPED WORKING NOT ALLOWING THE CAR TO BE PUT INTO ANY GEAR OTHER**

---

[33] NHTSA complaints are publicly available online and searchable by NHTSA ID Number at https://www.nhtsa.gov/recalls. All capitalization, typographical errors, and grammatical errors are original, unless stated otherwise.

**THAN 'PARK'. THE CAR WAS THEN PUT INTO 'PARK' WHERE IT STAYED STATIONARY IN A COMPROMISING POSITION UNTIL IT COULD BE TOWED.**[34]

- o 2013 Ford Fusion
  - NHTSA ID No.: 10939194
  - Filed January 3, 2017
  - Summary of Complaint:
  - SHIFTER CABLE WENT BAD AT 78000 MILES. THE CAR WOULD NOT GO DOWN IN GEAR. EVERY TIME YOU GO BACK IT WOULD STAY IN THAT GEAR AND NEVER GO BACK TO PARK. IT GOT STUCK IN THE SPORT GEAR AND NEVER ABLE TO GO TO NEUTRAL, DRIVE NOR PARK. THE DEALERSHIP SAID THAT THE CABLE FROM THE SHIFTER TO THE TRANSMISSION WAS BAD. **THIS PART COST $512 TO FIX AT THE DEALERSHIP**.
- o 2013 Ford Fusion
  - NHTSA ID No.: 10967841
  - Filed March 22, 2017
  - Summary of Complaint:
  - PLACED MY VEHICLE IN REVERSE, COMING OUT OF A PARKING LOT, I TRIED TO PLACE MY CAR IN DRIVE AND THE GEAR SHIFTER WAS STUCK.I CALLED THE TOW TRUCK, BECAUSE I COULDN'T MOVE MY CAR. **THE DEALERSHIP SERVICE DEPARTMENT TOLD ME IT WAS A BROKEN TRANSMISSION CABLE THAT NEEDED TO BE REPLACED. MY VEHICLE HAS 56200 MILES AND DOES NOT FALL INTO THE POWERTRAIN FACTORY WARRANTY**.
- o 2015 Ford Fusion
  - NHTSA ID No.: 11031415
  - Filed October 2, 2017
  - Summary of Complaint:

---

[34] Emphasis added throughout, unless stated otherwise.

- TRANSMISSION SHIFT CABLE BROKE. VEHICLE WILL NOT SHIFT OUT OF PARK. **SHIFT CABLE CONNECTOR IS PLASTIC AND DISINTEGRATED**.
  
  o 2015 Ford Escape
    - NHTSA ID No.: 10934163
    - Filed December 9, 2016
    - Summary of Complaint:
    - TL* THE CONTACT OWNS A 2015 FORD ESCAPE. WHILE THE VEHICLE WAS PARKED WITH THE SHIFT LEVER IN THE PARK POSITION, IT ROLLED BACKWARDS WHEN THE KEY WAS REMOVED FROM THE IGNITION. THE VEHICLE FAILED TO START. THE VEHICLE WAS TOWED TO A DEALER TO BE DIAGNOSED. THE CONTACT WAS INFORMED THAT THE SHIFTER CABLE FRACTURED AND NEEDED TO BE REPLACED. THE VEHICLE WAS REPAIRED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS 58,479. UPDATED 01/27/17*LJ THE CONSUMER STATED THE VEHICLE WAS REPAIRED ON DECEMBER 8, 2016
  
  o 2014 Ford Fusion
    - NHTSA ID No.: 11056126
    - Filed December 22, 2017
    - Summary of Complaint:
    - I PULLED INTO THE PARKING SPACE PUT MY CAR IN PARK GOT OUT WENT TO GO INTO MY JOB THANKFULLY I HAPPENED TO LOOK BACK AND NOTICED MY CAR ROLLING THE TRANSMISSION CABLE SHIFTER BROKE I THINK THIS NEEDS TO BE A RECALL BECAUSE WHAT IF SOMEBODY'S KIDS GOT OUT OF THE CAR AND WALKED BEHIND IT AND IT STARTED ROLLING; YOU PUT IT IN PARK YOU THINK THAT'S WHAT YOU DID AND I HAVE READ AFTER GOOGLING IT THIS IS A BIG ISSUE IT'S GOING TO END UP BEING IGNORED TILL SOMEBODY GETS HIT BY THEIR OWN CAR

28

OR A KID , EVEN AN ANIMAL OR ROLLS INTO AN OBJECT OF SOME SORT

- o 2013 Ford Fusion
  - ▪ NHTSA ID No.: 10892637
  - ▪ Filed August 2, 2016
  - ▪ Summary of Complaint:
  - ▪ I PUT MY VEHICLE IN PARK AND IT KEPT GOING DUE TO THE SHIFT LINKAGE BREAKING, IT REMAINED IN DRIVE THIS IS EXTREMELY UNSAFE AND SHOULD NOT BE HAPPENING TO A 3 YEAR OLD CAR WITH 88K ON IT. AFTER DOING SOME RESEARCH I DISCOVERED THIS QUITE COMMON AMONG THE NEWER FUSION'S, FOCUS'S AND OTHER FORD PRODUCTS...UPDATED 01/04/17 *BF THE CONSUMER STATED THE FAILURE WAS CAUSED BY THE PLASTIC BUSHING THAT HELD THE SHIFTER CABLE ONTO THE TRANSMISSION LINKAGE, WHICH CRACKED DUE TO DRY ROTTING. THIS MEANT EVEN THOUGH THE LEVER WAS SHIFTED INTO PARK, IT WAS NO LONGER ATTACHED TO THE TRANSMISSION. THEREFORE, THE VEHICLE WAS STILL IN PARK. THE VEHICLE WAS REPAIRED BY REPLACING THE ENTIRE SHIFTER CABLE. UPDATED 08/03/2017*JS
- o 2013 Ford Fusion
  - ▪ NHTSA ID No.: 10910084
  - ▪ Filed September 27, 2016
  - ▪ Summary of Complaint:
  - ▪ HELLO, MY NAME IS [XXX] AND I BOUGHT A BRAND NEW VEHICLE FROM FORD THREE YEARS AGO AND JUST RECENTLY, WHEN MY CAR WAS IN PARK, I SHIFTED THE GEAR AND IT WENT IN REVERSE. I GOT SCARED AND SHUT THE CAR OFF. IT DID NOT TURN ON AFTER THAT AND IT HAD TO GET TOWED TO GALPIN FORD IN NORTH HILLS. **FORD TOLD ME THAT IT WAS AN ERODED TRANSMISSION CABLE THAT I HAD TO PAY OUT OF POCKET TO REPAIR**. I DO NOT

29

UNDERSTAND WHY MY BRAND NEW CAR HAS AN ERODED PART IN IT. I LIVE IN SOUTHERN CALIFORNIA WHERE ARE THERE NO HAZARD WEATHER CONDITIONS. I GOOGLED HOW YOU COULD HAVE AN ERODED CABLE AND IT IS FROM ACID. IS THERE SOMETHING ELSE WRONG WITH MY CAR AND I AM IN DANGER TO DRIVE IT. **FORD HAS BEEN UNHELPFUL AND BASICALLY TELLING ME THERE IS NOTHING THEY CAN DO**. I FEEL LIKE FORDS PARTS ARE NOT UP TO SAFETY STANDARDS BY MY CASE AND WOULD LIKE AN INVESTIGATION DONE WITH FORD. PLEASE FEEL FREE TO CONTACT ME WITH ANY QUESTIONS. THANK YOU! [XXX] INFORMATION REDACTED PURSUANT TO THE FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C. 552(B)(6). *TR

- o 2014 Ford Fusion
  - NHTSA ID No.: 11113137
  - Filed July 23, 2018
  - Summary of Complaint:
  - MY WIFE ARRIVED AT WORK AND SHIFTED THE CAR INTO PARK. WHILE EXITING THE CAR STARTED ROLLING BACKWARDS. SHE HAD TO APPLY THE EMERGENCY BRAKE TO STOP IT. WHILE THE DASH AND SHIFTER SAID THE CAR WAS IN PARK IT WAS REALLY IN NEUTRAL OR REVERSE. I HAD THE CAR TOWED TO THE DEALERSHIP. THE REPLACED THE SHIFTER CABLE ASSEMBLY AND TOLD ME THAT A SMALL PLASTIC BUSHING BROKE AND THATS WHAT CAUSED THE ISSUE. TOTAL COST OF THE REPAIR WAS $410. THERE IS NOW A RECALL FOR THE EXACT SAME PROBLEM BUT THEY WILL NOT REFUND ME THE MONEY BECAUSE MY VIN IS NOT PART OF THE RECALL. THE RECALL NEEDS TO BE EXPANDED TO COVER MORE FUSION'S. MINE WAS AT THE FLAT ROCK ASSEMBLY PLANT AS THE RECALLED CARS WERE, JUST TWO WEEKS AFTER THE CUTOFF DATE OF SEPT.

14, 2013. FORD CORPORATE WAS NO HELP JUST TOLD ME TO CALL THE DEALER WHERE I HAD THE REPAIR DONE. TYPICAL FORD CUSTOMER SERVICE I MUST SAY AFTER DEALING WITH THEM FOR THE PAST 4+ YEARS.

- o 2013 Ford Fusion
  - NHTSA ID No.: 11112442
  - Filed Julu 19, 2018
  - Summary of Complaint:
  - TL* THE CONTACT OWNS A 2013 FORD FUSION. THE CONTACT STATED THAT THE VEHICLE FAILED TO START. THE VEHICLE WAS TOWED TO THE LOCAL DEALER (FOX FORD LINCOLN, 2501 N ELSTON AVE, CHICAGO, IL) WHERE **IT WAS DIAGNOSED THAT THE TRANSMISSION BUSHING AND SHIFT CABLE WERE FAULTY AND NEEDED TO BE REPAIRED**. THE VEHICLE WAS REPAIRED. **THE MANUFACTURER WAS NOTIFIED AND DID NOT ASSIST**. THE FAILURE MILEAGE WAS 103,000.
- o 2013 Ford Fusion
  - NHTSA ID No.: 11144901
  - Filed November 2, 2018
  - Summary of Complaint:
  - SHIFTER CABLE LINKAGE "BUSHING" RECALL DOES NOT SHOW UP BY MY VIN SEARCH. YET THE BUSHING IS ALREADY BUSTED AND HAS BEEN SO CALLED "HALF FIXED" BY MY FRIEND. I NEED HELP GETTING THIS FIX SAFELY PLEASE HELP.
- o 2014 Ford Fusion
  - NHTSA ID No.: 11113020
  - Filed July 12, 2017
  - Summary of Complaint:
  - TL* THE CONTACT OWNS A 2014 FORD FUSION. AFTER STARTING THE ENGINE AND SHIFTING THE TRANSMISSION INTO REVERSE**, THE VEHICLE WOULD NOT MOVE. THE VEHICLE WAS TOWED TO THE LOCAL DEALER** (JIM TAYLOR FORD LINCOLN, 1605 N. SERVICE RD,

31

EAST RUSTON, LA) **WHERE IT WAS DIAGNOSED THAT THE SHIFT CABLE BUSHING FAILED AND DETACHED FROM THE TRANSMISSION**. THE VEHICLE WAS REPAIRED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE CONTACT WAS INFORMED THAT **THE VIN WAS NOT INCLUDED IN NHTSA CAMPAIGN NUMBER: 18V471000** (POWER TRAIN). **THE CONTACT INDICATED THAT THE VEHICLE HAD EXPERIENCED THE SAME FAILURE LISTED IN THE RECALL**. THE FAILURE MILEAGE WAS 92,000.

- o 2013 Ford Fusion
  - ▪ NHTSA ID No.: 11210473
  - ▪ Filed May 28, 2019
  - ▪ Summary of Complaint:
  - ▪ TRANSMISSION CABLE BUSHING BROKE IN APRIL 2018.. STILL WAITING ON FORMAL RECALL
- o 2016 Ford Fusion
  - ▪ NHTSA ID No.: 11122108
  - ▪ Filed August 24, 2018
  - ▪ Summary of Complaint:
  - ▪ TL* THE CONTACT OWNS A 2016 FORD FUSION. THE CONTACT STATED THAT THE TRANSMISSION WAS IN A DIFFERENT GEAR THAN THE GEAR THAT WAS SELECTED BY THE CONTACT. AFTER REVERSING, THE CONTACT CHANGED THE GEAR TO DRIVE, BUT THE VEHICLE KEPT REVERSING. THE VEHICLE WAS TOWED TO SUNRISE FORD (5435 US-1, FORT PIERCE, FL 34982, (772) 461-6000) WHERE THE CONTACT WAS INFORMED THAT THE BUSHING NEEDED TO BE REPLACED. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE. THE FAILURE MILEAGE WAS UNKNOWN.
- o 2013 Ford Escape
  - ▪ NHTSA ID No.: 11119655
  - ▪ Filed August 13, 2018
  - ▪ Summary of Complaint:

32

- IN MAY 2018 I WAS DRIVING MY 2013 FORD ESCAPE, PULLED OUT OF A PARKING SPOT ONCE THE VEHICLE CORRECTED TO PULL AWAY I ATTEMPTED TO PUT THE VEHICLE INTO DRIVE AND THE GEAR SHIFT WOULD NOT MOVE HOWEVER THE GEAR SHIFT WAS READING THE VEHICLE IN PARK. DUE TO READING I WAS IN PARK I BELIEVED IT SAFE TO SHUT OFF THE VEHICLE AND ATTEMPT TO RESTART IT HOWEVER IT WAS NOT IN CORRECT GEAR AND WOULD NOT START. I BELIEVING THE VEHICLE WAS IN PARK, SHUT THE VEHICLE OFF AND QUICKLY REALIZED I DID NOT HAVE ANY CONTROL ANY LONGER, AND TO PREVENT AN ALMOST ACCIDENT WHEN THE VEHICLE BEGAN ROLLING DOWN A STEEP HILL IN SOUTHERN MIDDLE TN AND AS I ONE THIS WAS DONE, I PULLED THE EMERGENCY BRAKE BEFORE COLLIDING WITH ANOTHER CAR AND MY VEHICLE HAD TO BE TOWED. IT WAS WHEN IT WAS AT THE MECHANICS THAT IT WAS DISCOVERED THE SHIFT CABLE BUSHINGS NEEDED TO BE REPLACED. **I SAW IN LATE JUNE 18 OR EARLY JULY 18 THAT THEIR WAS NUMEROUS RECALLS FOR THIS SAME EXACT THING THAT HAPPENED TO MY VEHICLE HOWEVER MY VIN IS NOT PART OF THAT**.
  - o 2015 Ford Escape
    - NHTSA ID No.: 11112139
    - Filed July 18, 2018
    - Summary of Complaint:
    - TRANSMISSION CABLE BUSHING IS DEFECTIVE, CABLE POPS OFF SHIFTING LEVEL. THIS CAUSES A SERIOUS SAFETY ISSUE AS THE THE DRIVER PLACES THE VEHICLE IN PARK, BUT TRANSMISSION IS IN NEUTRAL CAUSING THE VEHICLE TO ROLL.
  - o 2013 Ford Fusion
    - NHTSA ID No.: 11092157
    - Filed May 7, 2018

33

- Summary of Complaint:
- MY FORD FUSION IS A 2013 WHICH MEANS ITS ONLY 5 YEARS OLD AND THE GEAR SHIFT BUSHING POPPED OFF, WHEN I WENT TO PUT MY CAR IN PARK THE TRANSMISSION WAS AUTOMATICALLY SWITCHED TO DRIVE. I LUCKILY NOTICED MY CAR WASN'T IN PARK BEFORE I WAS ABOUT TO STEP OUT THE CAR OR I COULD HAVE BEEN RAN OVER! **SINCE MY EXTENDED WARRANTY NOR MY CAR INSURANCE WON'T COVER THE COST BECAUSE ITS CONSIDERED WEAR AND TEAR I'M STUCK WITHOUT A VEHICLE TILL I FIND $600 TO FIX THE MECHANICAL PROBLEM**.

- o 2014 Ford Fusion
  - NHTSA ID No.: 11056126
  - Filed December 22, 2017
  - Summary of Complaint:
  - I PULLED INTO THE PARKING SPACE PUT MY CAR IN PARK GOT OUT WENT TO GO INTO MY JOB THANKFULLY I HAPPENED TO LOOK BACK AND NOTICED MY CAR ROLLING THE TRANSMISSION CABLE SHIFTER BROKE I THINK THIS NEEDS TO BE A RECALL BECAUSE WHAT IF SOMEBODY'S KIDS GOT OUT OF THE CAR AND WALKED BEHIND IT AND IT STARTED ROLLING; YOU PUT IT IN PARK YOU THINK THAT'S WHAT YOU DID AND I HAVE READ AFTER GOOGLING IT THIS IS A BIG ISSUE IT'S GOING TO END UP BEING IGNORED TILL SOMEBODY GETS HIT BY THEIR OWN CAR OR A KID , EVEN AN ANIMAL OR ROLLS INTO AN OBJECT OF SOME SORT.

- o 2016 Ford Fusion
  - NHTSA ID No.: 11113390
  - Filed July 24, 2018
  - Summary of Complaint:
  - 2016 FORD FUSION S AUTO TRANSMISSION SHIFT CABLE LINKAGE BUSHING BROKE, I WENT TO FORD DEALERSHIP EL CAJON MAIN STREET, TO ASK THEM IF MY CAR UNDER THIS WARRANTY

THIS SAID BRING YOUR CAR NEXT WEEK YOUR CAR NOT UNDER WARRANTY YOU HAVE 36800 MILES. WE WILL CHARGE YOU.

- o 2016 Ford Fusion
  - NHTSA ID No.: 11118592
  - Filed August 8, 2018
  - Summary of Complaint:
  - VEHICLE WAS STOPPED AND BEING PLACED INTO PARK FROM DRIVE. UPON MOVEMENT THE SHIFTER BECAME STUCK IN NEUTRAL. WAS ABLE TO MOVE TO MOVE THE SHIFTER TO PARK BUT VEHICLE SCREEN READ TRANSMISSION IN NEUTRAL. TOWED THE VEHICLE TO CAMELBACK FORD AND WAS ADVISED THE SHIFTING MECHANISM HAD BROKEN. THE BUSHING THAT CONNECTS THE SHIFTING CABLE TO THE TRANSMISSION HAD BROKEN RECALL 18V471000. FORD REFUSED TO REPLACE AS VIN WAS NOT IN THE BATCH AFFECTED CURRENTLY.
- o 2013 Ford Escape
  - NHTSA ID No.: 11252933
  - Filed September 3, 2019
  - Summary of Complaint:
  - THE BUSHING ON MY 2013 FORD ESCAPE HAS GONE OUT. **I AM UNABLE TO SHIFT MY VEHICLE INTO PARK OR REVERSE. IT WILL ONLY GO INTO DRIVE AND NEUTRAL.** I AM NOT ABLE TO GO ANYWHERE THAT I MAY NEED TO REVERSE. WHEN I START MY CAR AND PARK IT THE CAR HAS TO BE IN NEUTRAL AND I HAVE TO USE THE EMERGENCY BRAKE. THEIR ARE OTHER 2013 FORD ESCAPES WITH THIS ISSUE BUT THEY ARE SAYING MY VIN IS NOT ONE OF THEM. OBVIOUSLY MINE ALSO IS HAVING AN ISSUE WITH THE SAME PROBLEM. IT HAPPENED WHEN I WAS COMING DOWN A HILL GETTING READY TO PULL INTO A FRIENDS DRIVEWAY AND PARK. IT WOULD NOT LEAVE D AND WHEN IT DID IT WOULD ONLY GO INTO D OR N.
- o 2013 Ford Escape

- NHTSA ID No.: 11427638
- Filed August 3, 2021
- Summary of Complaint
- The vehicle will not shift gears. Luckily it is in my garage and I was not out driving when this happened. It appears to be in park, but it is actually in natural and I cannot shift it. In doing some research, I found that a the gear shift bushing is defective. In doing further research, I found that Ford does have a recall on this car for the EXACT reason (18S20) issues July 18, 2018 for 2013 Ford Escapes manufactured from May 15-Sept 15, 2013 in the Louisville plant. I contacted Ford and my car was manufactured on May 13, so it is not covered. This is extremely dangerous. Had I not done research online I was not aware that my car was not in park and all I had to do was simply push it forwards or backwards-with ease-to get it to roll. I have choked the tires to prevent this. But Ford refuses to fix it and I cannot locate a very simple replacement part that costs about $20 and 2 minutes to fix. Rather, I will have to spend $500+ towing to have an entire new cable installed. This is EXTREMELY dangerous and defective. Forth-eight hours or less for this not to be include in the recall is more than concerning and this recall must be updated to include more cars. I found several people online having the exact same issue...while driving and loosing control. Thank you.
  - 2015 Ford Escape
    - NHTSA ID No.: 11165468
    - Filed January 6, 2019
    - Summary of Complaint:
    - SHIFTER CABLE BROKE AT TRANSMISSION END. A BUSHING THAT HELPS CONNECT THE CABLE TO THE TRANSMISSION BROKE. IT ALLOWED ME TO PARK THE CAR WITHOUT THE TRANSMISSION IN PARK AND WITHOUT RECEIVING ANY AUDIBLE WARNING. IT ALSO CAUSED THE TRANSMISSION TO BE STUCK IN THE D POSITION, NOT ALLOWING ME TO START THE CAR AS I HAD NO WAY OF CHANGING GEARS. IF THE CAR WAS

36

ON A HILL, IT WOULD'VE ROLLED AWAY, CREATING A DANGEROUS SITUATION.

- o 2016 Ford Escape
  - NHTSA ID No.: 11258516
  - Filed September 27, 2019
  - Summary of the Complaint:
  - CAR BECAME STUCK IN PARK DUE TO A FAILURE OF A RUBBER BUSHING THAT SECURES THE TRANSMISSION SHIFT CABLE TO THE TRANSMISSION. THIS OCCURRED TO WHEN I WAS DRIVING OUT OF MY DRIVE WAY, I STOPPED TO CLOSE THE DRIVEWAY GATE AND THE CAR WOULD NOT SHIFT INTO DRIVE. CAR WAS STUCK IN PARK, TOW TRUCK FEE, FORD DIAGNOSTIC FEE WAS OVER $300 DOLLARS FOR A $7 DOLLAR RUBBER BUSHING. THIS CAR IS NOT SAFE AND SHOULD BE RECALLED DUE TO THE POTENTIAL ROLL AWAY IF THE TRANSMISSION IS STILL IN GEAR WHEN BUSHING FAILS.
- o 2016 Ford Escape
  - NHTSA ID No.: 11372835
  - Filed November 3, 2020
  - Summary of the Complaint:
  - I PUT MY VEHICLE IN PARK AND THEN TRIED TO PUT VEHICLE BACK IN GEAR. GEARSHIFT WOULD NOT MOVE WHEN BRAKE WAS DEPRESSED AND VEHICLE WAS ACTUALLY IN NEUTRAL **I HAD TO PUT EMERGENCY BRAKE ON TO PREVENT VEHICLE FROM ROLLING** AND HAVE VEHICLE TOWED TO HAVE BUSHING JOINING TRANSMISSION TO SHIFTER CABLE REPLACED. THIS IS SOMETHING THAT HAS BEEN COVERED UNDER PREVIOUS RECALL FOR 2014 ESCAPES AND VERY OBVIOUSLY IS STILL A PROBLEM.
- o 2016 Ford Escape
  - NHTSA ID No.: 11202923
  - Filed April 22, 2019
  - Summary of Complaint:

37

- WHILE DRIVING THE CAR, THERE WAS A SUDDEN LOSS OF CONTROL OVER GEAR SELECTION. REGARDLESS OF SHIFT LEVEL POSITION, "D" OR "S", GEARS WILL NOT SHIFT ABOVE 1ST GEAR, FORCING SPEED TO DECELERATE TO ONLY ABOUT 10 MPH. PARKING POSITION BECAME INOPERATIVE AS WELL, AND **THE CAR CONTINUED TO MOVE FORWARD WHILE IN "P". NO ALARMS OR WARNING LIGHTS APPEARED**. THE CAR WAS NOT ABLE TO CLIMB AN INCLINE, MEANING THAT EVEN 1ST GEAR IS NOT REALLY ENGAGED. THE PROBLEM SOUNDS LIKE A SIMILAR PROBLEM TO A RECALL ISSUED FOR 2013 AND 2014 ESCAPE MODEL YEARS, WHEN THE BUSHING THAT ATTACHES THE SHIFTER CABLE TO THE TRANSMISSION DETACHES. WE ARE STILL WAITING FOR A DIAGNOSIS FROM THE DEALER.

- o 2015 Ford Edge
  - NHTSA ID No.: 11366296
  - Filed October 25, 2020
  - Summary of Complaint:
  - WHEN PARKING THE VEHICLE THE SHIFTER GOT STUCK IN PARK BUT THE VEHICLE ITSELF WAS STUCK IN NEUTRAL. HAD TO PUT ON PARKING BRAKE AND GET VEHICLE TOWED (09/20). VEHICLE WAS FIXED. ISSUES WITH ELECTRONICS ON SHIFTER (10/19/20). REVERSING OUT OF DRIVEWAY ONTO STREET. **WHEN I ATTEMPTED TO SHIFT INTO DRIVE THE VEHICLE WOULD NOT SHIFT OUT OF NEUTRAL. COASTED DOWN THE HILL 500' AND PULLED OVER TO THE SHOULDER AT INTERSECTION**. SHIFTER WOULD MOVE BUT THE INDICTOR ON THE DASH WOULD NOT SAY IT WAS OUT OF NEUTRAL. I TRIED A FEW THINGS BEFORE PUTTING IT INTO PARK WHICH AGAIN LOCKED UP THE SHIFTER. SHIFTER WAS STUCK IN PARK BUT VEHICLE WAS IN NEUTRAL. HAD TO HAVE THE VEHICLE TOWED AGAIN TO FORD

DEALERSHIP. THIS TIME IT WAS THE SHIFTER BUSHING FELL APART. WAITING TO SEE WHAT HAPPENS NEXT WITH THIS ISSUE. LUCKILY IT WAS ONLY MYSELF AND NOT MY CHILDREN IN THE VEHICLE WHEN I HAD TO COAST DOWN THE HILL AND LEFT AT AN INTERSECTION.

- o 2015 Ford Edge
  - ▪ NHTSA ID No.: 11349595
  - ▪ Filed August 15, 2020
  - ▪ Summary of Complaint:
  - ▪ AFTER STOPPING TO PARK THE CAR IN A STREET PARKING SPOT (THE VEHICLE WAS STATIONARY), **I PLACED THE GEAR SHIFTER IN PARK, HOWEVER THE VEHICLE WENT INTO REVERSE.** THE SHIFTER CABLE BUSHING DEGRADED AND FELL OFF THE CABLE WHICH DETACHED THE CABLE FROM THE TRANSMISSION. I KNOW THAT OTHER FORD VEHICLES HAVE THE SAME ISSUE, BUT THERE IS NO RECALL ISSUED FOR FORD EDGE VEHICLES EVEN THOUGH THEY HAVE THE SAME PROBLEM. THE DEALERSHIP REPLACED THE WHOLE CABLE (CLAIMED THAT THE BUSHING IS PART OF THE CABLE) AND CHARGED ME $700. […].
- o 2015 Ford Edge
  - ▪ NHTSA ID No.: 11433117
  - ▪ Filed September 15, 2021
  - ▪ Summary of Complaint:
  - ▪ Failed Part: Shift cable attachment at the transmission; Safety Risk: Unable to shift gears from inside the cabin making driving hazardous; Confirmed By: Tow truck driver and 2 independent service centers; Inspected By: Tow truck driver and 2 independent service centers; Warnings: None; The shift cable bushing has been recalled on other Ford models built during the same time period. I'm reporting as this may be related. This occurred in a parking lot. **I reversed out of my parking spot, put the gear shift in drive, but the car was still in reverse.** Roadside assistance was called. He showed me that the

shift cable was not attached to the transmission. He was able to place the cable so that I could drive it a short distance to a service station for repair. The car is currently being repaired by an independent service center.

o  2016 Ford Edge
  ▪ NHTSA ID No.: 11207729
  ▪ Filed May 15, 2019
  ▪ Summary of Complaint:
  ▪ TRANSMISSION SHIFTER CABLE BUSHING DISINTEGRATED AND CABLE SNAPPED OFF A FEW TIMES!! THIS IS THE SAME ISSUE AFFECTING THE RECALLED 2014 FORD FUSION. **THEY ARE USING THE SAME BUSHING FOR THE FORD EDGE PER THE PARTS DEPARTMENT WHERE I BOUGHT THE REPLACEMENT. THE PARTS REP SAID THEY ARE SELLING THE BUSHING FOR FORD EDGES ALL THE TIME**. :(

o  2016 Ford Edge
  ▪ NHTSA ID No.: 11427943
  ▪ Filed August 5, 2021
  ▪ Summary of Complaint:
  ▪ The shifter cable for the power train became dislodge causing the car not to be able to shift from park, to neutral to drive. **The car had to be towed to be repaired by a Ford Dealership that charged $335 for labor and $10 for parts and in additional a $43 charge for Environmental Compliance**

o  2014 Ford C-Max
  ▪ NHTSA ID No.: 11005220
  ▪ Filed July 14, 2017
  ▪ Summary of Complaint:
  ▪ 2014 FORD CMAX ENERGI - 70,300 MILES PURCHASED NEW NOV. 2014. **WAS DRIVING SWITCH BACKS DOWN HILL WITH MY CAR IN LOW. I HEARD A NOISE AND SUDDENLY THE CAR SLIPPED OUT OF GEAR IN NEUTRAL**. I BRAKED TO A STOP. PUT IT IN PARK AND BACK TO DRIVE AND IT SEEMED FINE. A WEEK AND A LATER, IT DID IT AGAIN IN THE SAME DOWN

HILL PLACE ON THE SWITCH BACKS. I REALLY TAKES OFF WHEN IT UNEXPECTEDLY SLIPS OUT OF GEAR. I TOOK IT TO THE FORD AGENCY THE NEXT DAY TO HAVE IT CHECKED. THEY KEPT IT 42 DAYS (INCLUDING SUNDAYS) BUT NEVER FOUND THE CAUSE. […].

- o 2014 Ford Transit Connect
  - ▪ NHTSA ID No.: 11397560
  - ▪ Filed February 23, 2021
  - ▪ Summary of Complaint:
  - ▪ VEHICLE WAS STATIONARY. TRANSMISSION SHIFT CABLE BUSHING FELL OUT WHILE SHIFTING FROM PARK, **TRANSMISSION IS STUCK IN PARK AND CANNOT SHIFT**. FORD DEALERSHIP WILL NOT SELL THE PART.
- o 2016 Ford Transit Connect
  - ▪ NHTSA ID No.: 11329274
  - ▪ Filed June 16, 2020
  - ▪ Summary of Complaint:
  - ▪ ON 6-11-2020, I ATTEMPTED TO PUT MY 2016 TRANSIT CONNECT INTO DRIVE FROM PARK. I WAS AT A FAST FOOD DRIVE-THRU. **THE GEAR SHIFT LEVER STOPPED IN REVERSE. WE TRIED THE EMERGENCY NEUTRAL RESET AND IT WOULD NOT WORK.** THE WRECKER DRIVER MENTIONED THAT A PART UNDER THE HOOD MIGHT BE RESPONSIBLE, **NAMELY A SHIFTER BUSHING**. **HE HAD SEEN THIS PROBLEM IN FUSIONS AND FOCUSES**. HE WAS ABLE TO MANUALLY REPLACE THE CONNECTION LONG ENOUGH FOR US TO GET THE TRANSIT CONNECT ONTO THE WRECKER. THE DEALERSHIP DID DIAGNOSE THE ISSUE AS A SHIFTER BUSHING AND REPAIRED IT ON 6-12-2020. **I RESEARCHED THE PART NUMBER AND DISCOVERED THAT A RECALL HAS BEEN ISSUED FOR THAT PART NUMBER ON 2013-2016 FUSIONS AND 2013-2014 ESCAPES. I BELIEVE THAT THE TRANSIT CONNECT SHOULD BE ADDED TO THE RECALL**

**SINCE THE PART NUMBER USED WAS THE SAME**. *TR

77.    Further, the number of NHTSA complaints related to the Bushing Defect far exceeds the number of similar complaints for competitor vehicles. For instance, a search of NHTSA's complaint database for Toyota Rav4 (MY2013-2019) vehicles with complaints that include the terms "bushing," "roll," or "transmission cable," showed six complaints. Not one complaint concerns a "bushing" or "transmission cable," and only one complaint concerns a rollaway incident and the transmission not entering into the correct gear.[35] Likewise, there are three complaints for MY2013-2019 Kia Sportage vehicles with the terms "bushing," "roll," or "transmission cable," none of which discuss an issue similar to the Bushing Defect. Performing the same search for Ford Escape vehicles though, reveals a drastically different story. Within the last five years, there have been 183 complaints concerning MY2013-2019 Ford Escape vehicles that involve "bushing," "roll," or "transmission cable"—many of which are detailed above and precisely describe the Bushing Defect.

78.    On information and belief, NHTSA complaints typically account for a mere fraction of warranty claims related to the same issue.

---

[35] *See* NHTSA ID Number: 11323615.

79.     Ford dictates that when a repair is made under warranty (or warranty coverage is requested), service centers must provide Defendant with detailed documentation of the problem and the fix that describes the complaint, cause, and correction, and also save the broken part in case Ford later determines to audit the dealership or otherwise verify the warranty repair.

80.     For their part, service centers are meticulous about providing this detailed information about in-warranty repairs to Ford because Ford will not pay the service centers for the repair if the complaint, cause, and correction are not sufficiently described.

81.     Ford knew or should have known about the Bushing Defect because of the high number of supplemental oil changes beyond the recommended amounts that are reasonable to infer were reported to Ford as well as the replacement parts that are reasonable to infer were ordered from Ford. All of Ford's service centers are required to order replacement parts, including engine bearings and connecting rods, directly from Ford. Other independent vehicle repair shops that service Class Vehicles also order replacement parts directly from Ford.

82.     Ford routinely monitors part sales reports and is responsible for shipping parts requested by dealerships and technicians. Thus, Ford has detailed, accurate, and real-time data regarding the number and frequency of replacement part orders. The increase in orders of auto-parts necessary to fix damage caused by the

Bushing Defect in the Class Vehicles was known to Defendant and should have alerted it to the scope and severity of the Defect.

83.     In addition to NHTSA complaints and warranty records, complaints relating to the Bushing Defect were made on third party websites.

84.     For example, on August 24, 2017, the owner of a 2013 Ford Fusion posted a video on YouTube discussing the Bushing Defect and how the Defective Bushing disconnected from the shifter cable in his vehicle.[36] There are dozens of comments on the YouTube video made by other Class members reporting the same issue.

85.     On September 21, 2017, the owner of a 2014 Ford Escape reported on FordEscape.org that they were experiencing transmission issues and the vehicle "could shift but nothing would happen once in that gear (drive, reverse, etc...)."[37] The owner reported that the issue was due to "a grommet located under the air filter that connects the shifter to the transmission. Grommet for [sic] so it could not shift into gear because it was not attached any longer."

---

[36] **Exhibit 20**, https://www.youtube.com/watch?v=2BP1btlw780 (last accessed Dec. 21, 2022).

[37] **Exhibit 21**, https://www.fordescape.org/threads/my-transmission-issue-truck-not-going-into-gears.96530/#post-1079322 (last accessed Dec. 21, 2022).

86.    On September 29, 2019, the owner of a 2016 Transit Connect posted on FordTransitConnectForum.com that their "transmission won't shift into gear even though the shifter does move."[38] On July 3, 2021, an owner of a 2015 Transit Connect posted on FordTransitConnectForum.com that "Ford finally agreed to a recall on the shifter cable bushing that was posted years ago on this forum regarding the defective bushing on the 2013 - 2016 Ford Fusion."[39] In response, someone questioned why Ford took so long to publicly disclose a known defect: "Ford finally stepped up to address the known problem. Interesting that the recall covers even recent 2021 built vehicles, yet this problem has been around for a while. Perhaps Ford didn't have enough of the replacement parts to cover new builds and recalled vehicles. You have to wonder."

87.    On information and belief, Ford monitors third party websites for customer complaints regarding potential defects. For example, a Warranty Admin/ Service Advisor for Ford responded to a message board thread on reddit.com concerning a Defective Bushing recall and explained Ford's proposed remedy for the Defect.[40]

---

[38] **Exhibit 22**, https://fordtransitconnectforum.com/topic/8060-2016-shift-problem/ (last accessed Dec. 21, 2022).

[39] **Exhibit 23**, https://fordtransitconnectforum.com/topic/9101-safety-recall-21s24/ (last accessed Dec. 21, 2022).

[40] *See* **Exhibit 24**,

### 3.   Beginning in 2018, Ford has issued a series of rolling recalls due to the Bushing Defect

88.   Auto manufacturers are required to file a report with NHTSA within five days of identifying any safety related defects in its vehicles. 49 C.F.R. § 573 *et seq*. The initial report is required to identify all vehicles "potentially containing the defect" and include "a description of the manufacturer's basis for its determination of the recall population and a description of how the vehicles or items of equipment to be recalled differ from similar vehicles or items of equipment that the manufacturer has not included in the recall." *Id*. § 573.6. Additionally, the report must contain a "description of the defect" and "identify and describe the risk to motor vehicle safety reasonably related to the defect." *Id*.

89.   The purpose of these regulations is obvious: "To facilitate the notification of owners of defective and noncomplying motor vehicles …, and the remedy of such defects and noncompliances, by equitably apportioning the responsibility for safety-related defects and noncompliances with Federal motor vehicle safety standards among manufacturers of motor vehicles." *Id*. § 573.2.

90.   On July 16, 2018, Defendant issued its first recall in what would become a series of rolling recalls due to the Bushing Defect (the "2018 Recall")

------

https://www.reddit.com/r/fordescape/comments/vyek56/2016_transmission_shifter_recall/ (last accessed Dec. 21, 2022).

(Manufacturer Recall No. 18S20, NHTSA Campaign No. 18V-471, "Unintentional Rollaway Due to Detached Shift Cable"). The 2018 Recall impacted 504,182 vehicles equipped with a 6F35 six-speed automatic transmission. Specifically, the recalled vehicles included 2013-2014 Ford Escape, and 2013-2016 Ford Fusion vehicles.[41]

91.   In a 573 Report filed with NHTSA, Ford provided the following "Description of the Defect": [42]

> On affected vehicles, the bushing that attaches the shifter cable to the 6F35 transmission may detach from the transmission.
> A degraded shifter cable bushing that detaches from the transmission may allow the transmission to be in a gear state different than the gear shift position selected by the driver. The condition could allow the driver to move the shift lever to Park and remove the ignition key, while the transmission may not be in Park, with no warning message or audible chime.

92.   Ford acknowledged the "safety risk" created by the Defect, stating that "[i]f the parking brake is not applied, a degraded shifter cable bushing that detaches from the transmission could result in unintended vehicle movement, increasing the risk of injury or crash."[43]

---

[41] **Exhibit 2**, https://static.nhtsa.gov/odi/rcl/2018/RCLRPT-18V471-1223.PDF (last accessed Dec. 21, 2022).

[42] *Id.*

[43] *Id.*

93.     According to Ford, the defect in Fusion and Escape vehicles built between May 15, 2013 and September 15, 2013 was attributed to "the supplier [that] applied a lubricant to the bushing that attaches the shifter cable to the 6F35 transmission during the supplier component process that, over time, may cause the bushing to degrade."[44] For Fusion vehicles built between June 2, 2014 and August 31, 2015, Ford claimed that it identified a contaminant on the bushings and that these vehicle models were "exhibiting an elevated rate of bushing degradation due to the source of this contamination."

94.     Ford identified HI-LEX as the supplier of the defective bushings, but Ford did not provide any further information regarding the component.

95.     As part of the 2018 Recall, Ford offered to replace the Defective Bushings with bushings that were purportedly "produced free of known contaminants" and of "a material that is more robust."[45]

96.     Less than one year later, on May 13, 2019, Ford issued another recall (the "2019 Recall") (Manufacturer Recall No. 19S16, NHTSA Campaign No. 19V362000, "Unintentional Rollaway Due to Detached Shift Cable") affecting

---

[44] *Id.*

[45] *Id.*

259,182 2013-2016 Ford Fusion vehicles equipped with 2.5 liter engines due to the Defective Bushings.

97.     Ford's "Description of the Defect" was nearly identical to the description of the 2018 Recall, stating that "the bushing that attaches the shifter cable may degrade and detach from the transmission. A shift cable that detaches from the transmission may allow the transmission to be in a gear state different than the gear shift position selected by the driver."[46] Ford further disclosed that it was "aware of 3 reports of [sic] alleging property damage and 1 report alleging an injury" related to the Defect.[47]

98.     In its "Description of the Cause," Ford revealed that it does not know the cause of the bushing deterioration and that its "[r]oot cause investigation remains ongoing."[48] While Ford stated that it will "update this section when [its root cause investigation is] finalized," it never did so.

99.     In its "Chronology" of the 2019 Recall, filed with NHTSA in a 573 Report, Ford stated that following the 2018 Recall, it "continued to investigate root

---

[46] **Exhibit 25**, https://static.nhtsa.gov/odi/rcl/2019/RCLRPT-19V362-7298.PDF (last accessed Dec. 21, 2022).

[47] **Exhibit 26**, https://static.nhtsa.gov/odi/rcl/2019/RCLRPT-19V362-7132.PDF (last accessed Dec. 21, 2022).

[48] *Id*.

cause for the [Defect in 2014-2016 Fusion vehicles] and continued to monitor any field data on vehicles not included in 18V471."[49] This investigation led to the 2019 Recall after part return engineering analysis, material robustness testing to underhood fluids, powertrain package studies, and updated field data analysis showed that "the shifter cable bushing in 2.5 liter Fusion vehicles were performing different than other powertrains."

100.   Like the 2018 Recall, Ford proposed installing replacement bushings which it claimed were "of a different grade of material with heat stabilizer."[50] Ford also proposed inserting a protective cap over the shift cable bushing which was intended to "protect against contaminants."

101.   On October 8, 2019, Ford supplemented the 2018 Recall to include the installation of a "protective service cap."[51] However, Ford did not inform Class members that already had brought their vehicles into Ford dealerships pursuant to the 2018 Recall of this change. Indeed, Ford told all of its dealerships that "[v]ehicles that previously had shift bushing replacement under this program will not be required to come back for protective service cap."

---

[49] *Id*.

[50] *Id*.

[51] **Exhibit 27**, https://static.nhtsa.gov/odi/rcl/2018/RCMN-18V471-7200.pdf (last accessed Dec. 21, 2022).

102.   On March 9, 2021, Ford issued a Technical Service Bulletin ("TSB") to its dealerships, informing them that "[s]ome 2013-2016 Fusion, 2013-2018 C-MAX, 2013-2019 Escape, 2014-2021 Transit Connect, and 2015-2018 Edge vehicles may indicate an incorrect shifter lever position."[52] Ford stated that "[t]his may be due to the bushing at the transmission end of the shifter lever cable resulting in a mismatch of cluster and selected gear position. To correct the condition, follow the Service Procedure steps to replace the bushing and install the protective cap over the selector at the transmission end of the selector lever cable."

103.   Notably, Ford did not issue a recall for these vehicles. Instead, Ford told dealerships to replace the bushing and install a cap only if the vehicle experienced "one of the following symptoms" of the Defect: (1) shifter not moving the transmission to proper shifter position; (2) damaged shifter bushing; (3) missing shifter bushing; or (4) mismatch of cluster and selected gear position.[53]

104.   On May 24, 2021, Ford issued another recall for vehicles equipped with the Defective Bushings (the "2021 Recall") (Manufacturer Recall No. 21S24, NHTSA Campaign Number 21V376000, "Unintentional Rollaway Due to Detached

---

[52] **Exhibit 28**, https://static.nhtsa.gov/odi/tsbs/2021/MC-10189767-0001.pdf (last accessed Dec. 21, 2022).

[53] *Id*.

Shift Cable"). The 2021 Recall encompassed 192,080 Ford Transit Connect vehicles for model years 2013-2021.[54]

105.   Ford's description of the 2021 Recall was nearly identical to both the 2018 and 2019 Recalls, stating that "[o]n affected vehicles, the bushing that attaches the shifter cable to the transmission may degrade or detach. A damaged or missing bushing could prevent the shifter from moving the transmission to the intended gear position."[55]

106.   Ford stated in its 573 Report that as of January 31, 2021, Ford identified at least 6 field reports and 289 warranty reports related to the Bushing Defect in 2013-2021 Transit Connect vehicles. Further, in "February 2021 – April 2021," Ford "requested an analysis of shifter cable bushings collected from fleet vehicles by an independent engineering firm that identified the potential for thermal degradation."[56] Ford also revealed that it had conducted its own study which "found the bushing can degrade when in the presence of contaminants."

---

[54] **Exhibit 29**, https://static.nhtsa.gov/odi/rcl/2021/RCLRPT-21V376-9292.PDF (last accessed Dec. 21, 2022).

[55] *Id.*

[56] *Id.*

107.   Like the prior Recalls, the proposed remedy in the 2021 Recall was to replace the bushings and insert a protective cap.[57] Ford did not provide any information concerning how the replacement bushings differed, if at all, from the Defective Bushings.

108.   While Ford told drivers that it "**has not** issued instructions to stop driving your vehicle under this safety recall,"[58] its dealerships were told that they may not "demonstrat[e] or deliver[] any new in-stock vehicles involved in this recall" until they "replace the bushing and install the protective service cap over the selector at the transmission end of the shifter cable."[59] Ford also warned its dealers that "Federal law requires dealers to complete this recall service before a new vehicle is delivered to the buyer or lessee. Violation of this requirement by a dealer could result in a civil penalty of up to $21,000 per vehicle. Correct all vehicles in your new vehicle inventory before delivery."[60]

---

[57] *Id.*

[58] **Exhibit 30**, https://static.nhtsa.gov/odi/rcl/2021/RCONL-21V376-2335.pdf (last accessed Dec. 21, 2022) (emphasis in original).

[59] **Exhibit 31**, https://static.nhtsa.gov/odi/rcl/2021/RCMN-21V376-9338.pdf (last accessed Dec. 21, 2022).

[60] *Id.*

109.   Yet again, less than one year later on April 14, 2022, Ford issued another bushings-based recall (the "April 2022 Recall") (Manufacturer Recall No. 22S25, NHTSA Campaign Number 22V254000, "Unintentional Rollaway Due to Detached Shift Cable"). The April 2022 Recall encompassed 96,015 2015 Ford Escape vehicles equipped with 2-liter engines and 6F35 transmissions.[61]

110.   The April 2022 Recall described the Bushing Defect with nearly identical wording as the 2018, 2019, and 2021 Recalls, stating that "[o]n affected vehicles, the bushing that attaches the shifter cable to the transmission may degrade or detach. A damaged or missing bushing could prevent the shifter from moving the transmission to the intended gear position."[62]

111.   Ford still had not determined the cause of the Bushing Defect. Rather, Ford stated in its "Description of the Cause" included in the 573 Report that "[h]eat and humidity *have the potential* to contribute to the hydrological breakdown of the bushing material."[63]

112.   The April 2022 Recall offered a remedy for Class Vehicle owners "to have the under hood shifter bushing replaced and add a protective cap over the shift

---

[61] **Exhibit 32**, https://static.nhtsa.gov/odi/rcl/2022/RCLRPT-22V254-7953.PDF (last accessed Dec. 21, 2022).

[62] *Id*.

[63] *Id*.

cable bushing." Ford claimed to have adopted this fix because "[r]emedy shift bushings are manufactured from a different grade material with a heat stabilizer. Additionally, a cap will be installed over the shift bushing for protection against contaminants."[64]

113.   Finally, on June 10, 2022, Ford issued its most expansive recall yet ("the June 2022 Recall") (Manufacturer Recall No. 22S43, NHTSA Campaign No. 22V413000, "Unintentional Rollaway Due to Detached Shift Cable"), for 2,925,968 vehicles, comprised of the following vehicle models: 2013-2019 Ford Escape, 2013-2018 Ford C-Max, 2013-2016 Ford Fusion, 2013-2021 Ford Transit Connect, and 2015-2018 Ford Edge.[65]

114.   Ford's description of the Bushing Defect in the June 2022 Recall echoes the long history of recalls concerning the Defective Bushings. Specifically, Ford explains that "the bushing that attaches the shift cable to the transmission may degrade or detach. A damaged or missing bushing could prevent the shifter from moving the transmission to the intended gear position."[66]

---

[64] *Id.*

[65] **Exhibit 14**, https://static.nhtsa.gov/odi/rcl/2022/RCLRPT-22V413-2380.PDF (last accessed Dec. 21, 2022).

[66] *Id.*

115.   Despite five years of Recalls and offering a purported remedy, Ford reiterated in the 573 Report for the June 2022 Recall that the Bushing Defect's "[r]oot cause is unknown."[67] All Ford disclosed was that its root cause investigation showed that "heat and humidity *have the potential* to contribute to the hydrological breakdown of the bushing material." [68]

116.   In its "Chronology" of the June 2022 Recall, filed with NHTSA in a 573 Report, Ford noted that it was "[w]orking with NHTSA to investigate and understand shift bushing field performance, [and it] has previously recalled the Hilex (Hytrel 4556) shift bushing component in targeted vehicle populations due to elevated failure rates. These actions include: 18S20, 19S16, 21S24, and 22S25."[69]

117.   Ford also revealed that "[f]rom April 29, 2015, through March 31, 2022, Ford has identified 1,630 warranty reports and 233 VOQs" attributed to the Bushing Defect.[70] Further, Ford disclosed that as of June 10, 2022, it was aware of

---

[67] *Id.*

[68] *Id.*

[69] *Id.*

[70] *Id.*

at least six reports alleging property damage and four reports alleging an injury related to the Bushing Defect.[71]

118.   Ford's proposed remedy in the June 2022 Recall again requires Class Vehicle owners to replace under the hood shift cable bushings and add a protective cap over the shift bushing for protection against contaminants.[72]

### D. Ford still does not offer Class members a *bona fide* remedy for the Bushing Defect, and leaves drivers with dangerous vehicles.

119.   After multiple safety related Recalls and years of root cause investigations, Ford still does not understand the cause of the Bushing Defect, and therefore, has resorted to temporary band-aid solutions for the Defect.

120.   Ford claims in the June 2022 Recall that it will install replacement shift bushings that are manufactured from a different grade material with a heat stabilizer. But by Ford's own admission it does not know whether heat is in fact the cause of the bushing degradation.

121.   Ford first began to install the replacement bushings with a heat stabilizer in the 2019 Recall. Since then, Class members reported that they continued to suffer from the Bushing Defect. For example, one Class member reported that the bushing installed in their 2015 Ford Fusion as part of the 2019 Recall "disintegrated

---

[71] *Id.*

[72] *Id.*

again in 2021."[73] Another Class member, the owner of a 2016 Ford Fusion, reported that in September 2022, after the vehicle was serviced under the 2019 Recall, it suffered from a rollaway incident and the bushing was found to have been detached from the shifter cable.[74]

122.   Not only are the replacement bushings insufficient, but the protective cap does little to remedy the Bushing Defect. Ford has stated that the protective cap is simply designed to "help[] protect against contaminants."[75] But in its most recent Recall, Ford lists "heat and humidity" as a potential cause of the Defect. Ford did not repeat its prior opinion that contaminants were a potential cause of the Bushing Defect. Indeed, the protective cap may increase the "heat and humidity" around the bushing, leading to faster degradation.

123.   In a communication to dealerships concerning the June 2022 Recall, Ford issued a "NEW VEHICLE DEMONSTRATION / DELIVERY HOLD" on the Class Vehicles and warned dealerships not to "demonstrat[e] or deliver[] any new in-stock vehicles involved in this recall" until they "replace the transmission shifter

---

[73] **Exhibit 3**, https://fordtransitconnectforum.com/topic/8243-safety-recall-18s20-%E2%80%93-shift-cable-bushing-replacement/ (last accessed Dec. 21, 2022).

[74] NHTSA ID Number: 11483259.

[75] *See* **Exhibit 26**, https://static.nhtsa.gov/odi/rcl/2019/RCLRPT-19V362-7132.PDF (last accessed Dec. 21, 2022).

cable bushing and protective cap."[76] Ford also reiterated to its dealers that "Federal law requires dealers to complete this recall service before a new vehicle is delivered to the buyer or lessee. Violation of this requirement by a dealer could result in a civil penalty of up to $21,000 per vehicle. Correct all vehicles in your new vehicle inventory before delivery." [77]

124.   Despite the admonition to its dealerships, Ford tells Plaintiffs and Class members that they should ignore the safety risks and continue driving their vehicle, even if Ford has yet to remedy the Bushing Defect. In a notice sent to Class Vehicle owners in connection with the June 2022 Recall, Ford again states that it "**has not** issued instructions to stop driving your vehicle under this safety recall."[78]

125.   Ford has put Plaintiffs and Class Vehicle owners in an impossible situation. They cannot remedy their vehicles because Ford's proposed remedy is inadequate. At the same time, Ford has not offered Plaintiffs and other Class members alternative means of safe and reliable transportation.

---

[76] **Exhibit 13**, https://static.nhtsa.gov/odi/rcl/2022/RCMN-22V413-4667.pdf (last accessed Dec. 21, 2022).

[77] **Exhibit 31**, https://static.nhtsa.gov/odi/rcl/2021/RCMN-21V376-9338.pdf (last accessed Dec. 21, 2022).

[78] **Exhibit 33**, https://static.nhtsa.gov/odi/rcl/2022/RIONL-22V413-5739.pdf (last accessed Dec. 21, 2022) (emphasis in original).

126.   Not only has Ford failed to offer an adequate remedy for the Bushing Defect, Ford refuses to provide loaner vehicles or reimburse Class members for rental expenses while they wait for their repairs.[79]

127.   Additionally, Ford refuses to reimburse Class members for past incidental out of pocket expenses caused by the Bushing Defect.[80] Thus, when a Class Vehicle is left in a Class member's driveway stuck in park, and a $500 towing expense is incurred, Ford will not reimburse the owner for that expense.[81] Nor will Ford reimburse a Class member if their vehicle is involved in a rollaway accident and damages the vehicle or other personal property. Rather, Ford will only refund "the cost associated with the transmission shifter cable bushing."[82] Making matters

---

[79] **Exhibit 34**, https://static.nhtsa.gov/odi/rcl/2022/RCMN-22V413-6253.pdf (last accessed Dec. 21, 2022).

[80] *See id.*

[81] *See* **Exhibit 35**, https://fordauthority.com/2019/05/2013-2016-ford-fusion-recalled-due-shift-cable-bushing/ (last accessed Dec. 21, 2022) ("Ford is a joke. My recalled part broke while I was driving down the road and I almost crashed and killed myself due to this recalled part. They [sic] recall form says that the car is safe to drive and that was a LIE!! Now my car is undrivable and stuck at a non Ford Dealership and Ford will not pay for towing to get it to a certified Ford dealership to fix what is their problem!!").

[82] **Exhibit 34**, https://static.nhtsa.gov/odi/rcl/2022/RCMN-22V413-6253.pdf (last accessed Dec. 21, 2022).

worse, Class Vehicle owners have reported that they incurred unreimbursed out of pocket expenses related to Defect repairs as recently as November 16, 2022.[83]

128.    The burden that Ford has placed upon Class members is considerable. As the owner for a 2014 Escape complained of in an August 13, 2022 NHTSA complaint:

> My transmission shifter cable bushing failed while on a car ride home with my son leaving me stranded 96 miles from home. I had to pay $450 to tow it home. Ford doesn't have any parts to fix my vehicle that I can not drive and only recommends I rent a car until October. I can not afford this as I am a single mom and teacher....school resumes in 2 weeks.[84]

129.    As a result of Ford's failure to remedy the Bushing Defect, Plaintiffs and Class Vehicle owners must continue to drive their Class Vehicles despite the known safety risk, putting themselves and others at grave risk of injury, and continue to incur unreasonable expenses due to Ford's actions.

## TOLLING OF STATUTES OF LIMITATIONS

130.    Any applicable statute(s) of limitations have been tolled by Defendant's knowing and active concealment and denial of the facts alleged herein. Plaintiffs and

---

[83] *See* NHTSA ID Number: 11493769 (2014 Ford Escape: "The shifter cable bushing went out on my vehicle and had to have it repaired on 11/1/2022. I had to pay out of pocket for this….").

[84] NHTSA ID Number: 11479141.

the members of the Class could not have reasonably discovered the true nature of the Bushing Defect because Defendant concealed it. Plaintiffs' claims were thus tolled pursuant to the discovery rule, for fraudulent concealment, and for estoppel.

### A. Discovery Rule

131.   The causes of action alleged herein did not accrue until Plaintiffs and Class members discovered that their Class Vehicles contained the Bushing Defect.

132.   As alleged above, Class members had no way of knowing about the Bushing Defect in their Class Vehicles. Defendant concealed its knowledge of the Defect while it continued to market and sell the Class Vehicles as safe, secure, high-quality, and reliable vehicles. To this day, Defendant has failed to disclose the full extent of the Defect and maintains that the putative "remedies" offered in the Recalls fix the Bushing Defect.

133.   Within any applicable statute(s) of limitation, Class members could not have discovered through the exercise of reasonable diligence that Defendant was concealing the conduct complained of herein and misrepresenting the true qualities of the Class Vehicles. Class members acted reasonably and diligently in attempting to find the source of the Bushing Defect.

134.   Class members did not know facts that would have caused a reasonable person to suspect that there was a Bushing Defect affecting their vehicle, and an ordinary person would be unable to appreciate that the vehicle was defective. Indeed,

even after Ford knew that the Class Vehicles contained the Defective Bushings, Ford denied responsibility and stated that the bushing degradation was normal wear and tear[85] and/or that the putative remedies offered in the Recalls alleviate the risks created by the Defect. As explained above, Ford does not know whether the putative remedies fix the Defect, and there are reports that squarely contradict Ford's opinion.

135.   For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to the claims in this litigation.

**B. Fraudulent Concealment**

136.   As the manufacturers, distributors, sellers, and/or warrantors of the Class Vehicles, Defendant was under a continuous duty to disclose to Class members the existence of the Defect found in the Class Vehicles.

137.   Defendant was and remains under a continuing duty to disclose to Plaintiffs and the members of the Class the true character, quality, and nature of the Class Vehicles—that the Bushing Defect found in the Class Vehicles fails to protect passengers from severe physical injury or death in the event of a rollover accident and diminishes the resale value of the Class Vehicles.

138.   Defendant recklessly disregarded the true nature, quality, and character of the Class Vehicles by failing to disclose the existence of the Bushing Defect.

---

[85] *See, e.g.*, NHTSA ID Numbers: 11092157, 10910084.

139.   Due to Defendant's concealment throughout the time period relevant to this action, all applicable statutes of limitation have been tolled.

140.   Instead of publicly disclosing the Defect in the Class Vehicles, Defendant kept owners and lessees in the dark about the Defect present in its vehicles, which creates unreasonable safety risks to drivers, passengers, and bystanders. To this day, Defendant has knowingly or recklessly failed to disclose the full extent of the Defect and has failed to offer adequate remedies for the Defect.

141.   Class members were not at fault for failing to discover the existence of the Defect present in their Class Vehicles.

142.   Plaintiffs had no actual or presumptive knowledge of facts sufficient to put them on inquiry notice of the existence of the Bushing Defect.

143.   This ignorance of the existence of the Defect present in the Class Vehicles is common across Plaintiffs and each Class member.

**C. Estoppel**

144.   Defendant was, and is, under a continuous duty to disclose to Plaintiffs and Class members the true character, quality, and nature of the Class Vehicles.

145.   Defendant failed to disclose the existence of the Defect and actively concealed the true character, quality, and nature of the Class Vehicles while knowingly making representations about the safety, quality, and reliability of the Class Vehicles. Plaintiffs and Class members reasonably relied upon Defendant's

knowing and affirmative representations and/or active concealment of these facts. Based on the foregoing, Defendant is estopped from relying on any statutes of limitation in defense of this action.

## CLASS ALLEGATIONS

146.   Plaintiffs bring this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and all others similarly situated.

147.   Plaintiffs seek to represent a class ("Nationwide Class") defined as:

> All persons or entities in the United States who purchased or leased a 2013-2019 Ford Escape, 2013-2016 Ford Fusion, 2013-2018 Ford C-Max, 2013-2021 Ford Transit Connect, and 2015-2018 Ford Edge.

148.   In addition, and in the alternative to the Nationwide Class, Plaintiff Diaz seeks to represent a class ("New York Class"), defined as:

> All persons or entities in the United States who purchased or leased a 2013-2019 Ford Escape, 2013-2016 Ford Fusion, 2013-2018 Ford C-Max, 2013-2021 Ford Transit Connect, and 2015-2018 Ford Edge, in the state of New York.

149.   In addition, and in the alternative to the Nationwide Class, Plaintiff Connors seeks to represent a class ("Missouri Class"), defined as:

> All persons or entities in the United States who purchased or leased a 2013-2019 Ford Escape, 2013-2016 Ford Fusion, 2013-2018 Ford C-Max, 2013-2021 Ford Transit Connect, and 2015-2018 Ford Edge, in the state of Missouri.

150.   The Nationwide Class and the New York and Missouri Class are collectively referred to herein as the Classes.

151.   Excluded from the Classes are Defendant, its affiliates, employees, officers and directors, persons or entities that purchased Class Vehicles for resale, and the Judge(s) assigned to this case. Plaintiffs reserve the right to modify, change, or expand the Classes' definitions based on discovery and further investigation.

152.   <u>Numerosity</u>: Upon information and belief, the Classes are so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Classes are unknown at this time, such information being in the sole possession of Defendant and obtainable by Plaintiffs only through the discovery process, Plaintiffs allege that at least 2.9 million Class Vehicles have been sold and leased in the United States that are affected by the Defect.

153.   <u>Existence and Predominance of Common Questions of Fact and Law</u>: Common questions of law and fact exist as to all members of the Classes. These questions predominate over the questions affecting individual Class members. These common legal and factual questions include, but are not limited to:

        a.  whether the Class Vehicles were sold with the Bushing Defect;

        b.  whether Defendant engaged in the conduct alleged herein;

    c. whether Defendant advertised, marketed, distributed, leased, sold, or otherwise placed the Class Vehicles into the stream of commerce in the United States;

    d. whether Defendant knew of the Bushing Defect but failed to disclose the problem and its consequences to its customers;

    e. whether a reasonable consumer would consider the Bushing Defect or its consequences to be material;

    f. when Defendant discovered the Bushing Defect in the Class Vehicles, and what, if anything, it did in response;

    g. whether Defendant should be required to fully disclose the existence of the Bushing Defect;

    h. whether Defendant breached its express and/or implied warranties with respect to the Class Vehicles;

    i. whether Plaintiffs and Class members overpaid for their Class Vehicles;

    j. whether Defendant was unjustly enriched; and

    k. whether Plaintiffs and Class members experienced out-of-pocket losses as a result of the Bushing Defect, and if so, how much.

154. <u>Typicality</u>: Plaintiffs' claims are typical of the claims of the Classes because Plaintiffs purchased their Class Vehicles with the same Bushing Defect as

did each member of the Classes. Furthermore, Plaintiffs and all Members of the Classes sustained monetary and economic injuries including, but not limited to, ascertainable losses arising out of Defendant's wrongful conduct. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all absent Class members.

155. <u>Adequacy</u>: Plaintiffs are adequate representatives because their interests do not conflict with the interests of the Classes that Plaintiffs seek to represent, Plaintiffs have retained counsel competent and highly experienced in complex class action litigation, and they intend to prosecute this action vigorously. The interests of the Classes will be fairly and adequately protected by Plaintiffs and their counsel.

156. <u>Superiority</u>: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and Members of the Classes. The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct. It would be virtually impossible for Members of the Classes individually to redress effectively the wrongs done to them. Even if the Members of the Classes could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the

delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court. Upon information and belief, members of the Class can be readily identified and notified based on, *inter alia*, Defendant's vehicle identification numbers, warranty claims, registration records, and database of complaints.

157. Defendant has acted, and refused to act, on grounds generally applicable to the Classes, thereby making appropriate final equitable relief with respect to the Classes as a whole.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
(15 U.S.C. § 2301, et seq.)
(On behalf of the Nationwide Class or alternatively, on behalf of each state-specific Class)

158. Plaintiffs reallege and incorporate by reference all preceding allegations as though set forth herein.

159. Plaintiffs bring this claim individually and on behalf of the other members of the Nationwide Class or alternatively, on behalf of each state-specific Class.

160.   This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332(a)-(d).

161.   The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). Plaintiffs and Nationwide Class members are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its implied warranties.

162.   Ford is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

163.   15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied warranty.

164.   Ford provided Plaintiffs and Nationwide Class members with an implied warranty of merchantability in connection with the purchase or lease of their vehicles that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7). As a part of the implied warranty of merchantability, Ford warranted that the Class Vehicles were fit for their ordinary purpose and would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

165.   Ford breached its implied warranties, as described herein, and is therefore liable to Plaintiffs under 15 U.S.C. § 2310(d)(1). Without limitation, the Class Vehicles share a common defect in that they are all equipped with a defective

shift cable bushing that could prevent the shifter from moving the transmission to the intended gear position, causing an unreasonable risk of rollaway resulting in serious bodily harm, crashes, and property damage to owners and lessees of the Class Vehicles. The Bushing Defect rendered the Class Vehicles unmerchantable and unfit for their ordinary use of driving when they were sold or leased, and at all times thereafter.

166.   As discussed herein, on information and belief, Ford knew or should have known about the Bushing Defect based on, *inter alia*, field reports, warranty claims, VQQs, its own rolling recalls of Class Vehicles equipped with the Defective Bushings, and ongoing investigations concerning the Defective Bushings and the Defect. For years, Ford omitted information about the Bushing Defect and its consequences from Plaintiffs and Class members, misrepresented the qualities of the Class Vehicles, and has failed to provide a *bona fide* remedy for the Bushing Defect.

167.   Any effort by Ford to limit the implied warranties in a manner that would exclude coverage of the Class Vehicles is unconscionable, and any such effort to disclaim or otherwise limit such liability is null and void.

168.   Any limitations Ford might seek to impose on its warranties are procedurally unconscionable. There was unequal bargaining power between Ford and Plaintiffs because, at the time of purchase and lease, Plaintiffs had no other options for purchasing warranty coverage other than directly from Ford.

169.   Any limitations Ford might seek to impose on its warranties are substantively unconscionable. Ford knew or should have known that the Class Vehicles were defective and that the Class Vehicles could cause grave injuries or property damage when used as intended long before Plaintiffs and Class members knew or should have known. Ford failed to disclose this defect to Plaintiffs and Class members. Thus, enforcement of the durational limitations on the warranties is harsh and would shock the conscience.

170.   Plaintiffs have had sufficient direct dealings with either Ford or its dealerships to establish privity of contract between Ford and Plaintiffs. Nonetheless, privity is not required here because Plaintiffs are intended third-party beneficiaries of contracts between Ford and its dealers, and specifically, of Ford's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit consumers. Finally, privity is also not required because the Class Vehicles are dangerous instrumentalities due to the aforementioned defect, as the Bushing Defect presents an unreasonable risk of crashes, serious bodily harm, and property damage to owners and lessees of the Class Vehicles.

171.   Under 15 U.S.C. § 2310(e), Plaintiffs are entitled to bring this class action and are not required to give Ford notice and an opportunity to cure until such

time as the Court determines the representative capacity of Plaintiffs under Rule 23 of the Federal Rules of Civil Procedure.

172.   The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed based on all claims to be determined in this lawsuit. Plaintiffs, individually and on behalf of all other Nationwide Class members, seek all damages permitted by law, including diminution in value of the Class Vehicles, in an amount to be proven at trial. In addition, under 15 U.S.C. § 2310(d)(2), Plaintiffs are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiffs and Nationwide Class members in connection with the commencement and prosecution of this action.

173.   Plaintiffs also seek the establishment of a Ford-funded program for Plaintiffs and Nationwide Class members to recover out-of-pocket costs incurred in attempting to rectify and mitigate the effects of the Bushing Defect in their Class Vehicles.

## COUNT II

## FRAUDULENT CONCEALMENT

(Common law)
(On behalf of the Nationwide Class or alternatively, on
behalf of each state-specific Class)

174.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

175.   Plaintiffs bring this claim on behalf of themselves and the Nationwide Class under the common law of fraudulent concealment (or "fraud by concealment"), which is materially uniform in all states. In the alternative, Plaintiffs bring this claim on behalf of each state-specific Class under the laws of each respective state.

176.   A nationwide class is appropriate because the elements of a fraudulent concealment claim are virtually identical in all states. In all states, Plaintiffs can prevail by showing that: (i) Ford had a duty to disclose material facts in connection with the sale or lease of the Class Vehicles; (ii) Ford either (a) knowingly made a false representation concerning material information in connection with the sale or lease of the Class Vehicles; (b) knowingly concealed material information in connection with the sale or lease of the Class Vehicles; or (c) knowingly failed to disclose material information in connection with the sale or lease of the Class Vehicles; and (iii) as a result of Ford's conduct, Plaintiffs suffered economic

damages. Ford concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

177.   Ford sold the Class Vehicles without disclosing the Bushing Defect and concealed and suppressed the defect from regulators and consumers.

178.   Ford concealed and suppressed the Bushing Defect with the intent to deceive Plaintiffs.

179.   Ford did so in order to falsely assure purchasers, lessees, and owners of the Class Vehicles that the vehicles they were purchasing or leasing were safe and reliable and would live up to the performance characteristics associated with the Ford brand, and then to avoid the cost and negative publicity of a recall. The concealed information was material to consumers, both because it concerned the quality, safety, and performance of the Class Vehicles and because the information would have significantly decreased the value and sales price of the vehicles.

180.   Ford had a duty to disclose the Bushing Defect because it was known and only knowable by Ford; Ford had superior knowledge and access to the facts; and Ford knew the facts were not known to, or reasonably discoverable by, Plaintiffs. Ford also had a duty to disclose because it made many affirmative representations about the safety, durability, and quality of the Class Vehicles, as set forth above; these representations were misleading, deceptive, and incomplete without the disclosure of the Bushing Defect. Finally, once the Class Vehicles were on the road,

Ford had a duty to monitor the Class Vehicles under the TREAD Act and implementing regulations, including the duty to promptly notify consumers of known safety defects.

181.  Ford concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt Ford's image and cost Ford money, and it did so at the expense of Plaintiffs and the Nationwide Class.

182.  On information and belief, Ford has still not made full and adequate disclosure and continues to defraud Plaintiffs and the Nationwide Class and conceal material information regarding the Bushing Defect.

183.  Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Class Vehicles if they had known of the Bushing Defect. Plaintiffs' actions were justified. Ford was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

184.  Because of the concealment and/or suppression of the facts, Plaintiffs and other class members sustained damage. In purchasing their Class Vehicles, Plaintiffs did not get the benefit of their bargain since the vehicles were worth less than they would have been without the defect, and because they own vehicles that diminished in value as a result of Ford's concealment of, and failure to timely disclose and remedy, the defect. Had Plaintiffs been aware of the concealed defects

that existed in the Class Vehicles, Plaintiffs would have paid less for their vehicles or would not have purchased them at all.

185.   Accordingly, Ford is liable to Plaintiffs and the Nationwide Class for damages in an amount to be proven at trial.

186.   Ford's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and class members' rights and well-being in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III
## UNJUST ENRICHMENT

(Common law)
(On behalf of the Nationwide Class or alternatively, on
behalf of each state-specific Class)

187.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

188.   Plaintiffs bring this claim individually and on behalf of the other members of the Nationwide Class, or, in the alternative, on behalf of each state-specific Class under the laws of each respective state. A Nationwide Class is appropriate because the elements of unjust enrichment are uniform in all states.

189.   This claim is pleaded in the alternative to the contract-based claims brought on behalf of Plaintiffs and the Nationwide Class.

190.  Ford has received and retained a benefit from Plaintiffs and each Class member, and inequity has resulted.

191.  Ford has benefitted from selling, leasing, and distributing the Class Vehicles for more than they were worth because of Ford's conduct described herein, at a profit, and Plaintiffs and putative class members have overpaid for the Class Vehicles.

192.  Thus, Plaintiffs and the Nationwide Class conferred a benefit on Ford.

193.  It is inequitable for Ford to retain these benefits.

194.  Plaintiffs and Nationwide Class members were not aware of the true facts about the Class Vehicles and did not benefit from Ford's conduct described herein.

195.  Ford knowingly accepted the benefits of its unjust conduct.

196.  As a result of Ford's conduct, the amount of its unjust enrichment should be determined in an amount according to proof.

**COUNT IV**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
(UCC § 2-314)
(On Behalf of the Nationwide Class)

197.  Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

198.   Plaintiffs bring this claim individually and on behalf of the other members of the Nationwide Class for breach of implied warranty pursuant to Uniform Commercial Code ("UCC") § 2-314.

199.   Defendant is a "merchant," a "seller," and a "lessor" of motor vehicles under the UCC.

200.   Ford was, at all relevant times, the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles. Ford knew or had reason to know of the specific use for which the Class Vehicles were purchased.

201.   The Class Vehicles were not merchantable when sold or leased because they contain the Bushing Defect and pose an unreasonable risk of injury or crash due to the Bushing Defect as described herein. Without limitation, the Class Vehicles share a common defect in that they are all equipped with the Bushing Defect that makes the vehicles susceptible to rollaway or unexpected gear shifting, causing an unreasonable risk of serious bodily harm and property damage to lessees and owners of the Class Vehicles. This Bushing Defect renders the Class Vehicles, when sold or leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving.

202.   Ford breached the implied warranty of merchantability by selling Class Vehicles containing a defect leading to grave risk of injury or crash during ordinary

operating conditions. This defect has deprived Plaintiffs and Nationwide Class members of the benefit of their bargain.

203. Ford was provided notice of the issues raised in this Count and this Complaint, as detailed above. Ford had actual knowledge of the Bushing Defect, and wrongfully and fraudulently concealed these material facts from Plaintiffs and the Nationwide Class. Ford was provided notice of these issues through, *inter alia*, the filing of this Complaint, warranty claims, customer complaints filed with NHTSA and posted online, and its own root cause investigations concerning the Bushing Defect before or within a reasonable amount of time after the allegations of the Bushing Defect became public. On November 21, 2022, Plaintiffs, individually and on behalf of the Classes, also notified Ford of the Bushing Defect and the breach of warranty alleged herein through a notice letter. Notice of breach, however, is not required because Plaintiffs and Nationwide Class members did not purchase their automobiles directly from Ford.

204. Plaintiffs and other Nationwide Class members have had sufficient direct dealings with either Defendant or its agents (*e.g.*, dealerships, consumer affairs departments, and technical support) to establish privity of contract between Defendant on one hand, and Plaintiffs and each of the other Class members on the other hand. Nonetheless, privity is not required here because Plaintiffs and each of the other Class members are intended third-party beneficiaries of contracts between

Defendant and its dealers, and specifically, of Defendant's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumers only. Defendant was also aware that the ultimate consumers of the Class Vehicles (*i.e.*, the Class) required vehicles that would function safely, could be relied upon, and otherwise meet minimum industry standards. Additionally, privity is excused here because Plaintiffs and each of the other Class members relied on statements made by Defendant itself in choosing to purchase or lease a Class Vehicle. As alleged herein, the marketing of the Class Vehicles was uniform, and was controlled and disseminated directly by Defendant.

205. As a direct and proximate result of Defendant's breach of the implied warranty of merchantability, Plaintiffs and Nationwide Class members have been damaged in an amount to be proven at trial.

206. Plaintiffs, on behalf of themselves and the Class, seek monetary damages, costs, attorneys' fees, and such other and further relief provided by law and equity.

## COUNT V

## VIOLATIONS OF THE DECEPTIVE ACTS AND PRACTICES STATUTE

(N.Y. GEN. BUS. LAW § 349 *et seq.*)
(Individually and on behalf of the New York Class)

207.    Plaintiff Diaz ("Plaintiff," for purposes of the New York Class's claims) realleges and incorporates by reference all preceding allegations as though fully set forth herein.

208.    Plaintiff brings this claim individually and on behalf of the other members of the New York Class.

209.    The New York Class members and Defendant are "persons" under N.Y. GEN. BUS. LAW § 349(h), the New York Consumer Protection from Deceptive Acts and Practices statute ("NY DAP").

210.    Defendant's actions, as set forth herein, occurred in the conduct of trade or commerce under the NY DAP.

211.    The NY DAP makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. GEN. BUS. LAW § 349. Defendant's conduct, as set forth herein, constitutes deceptive acts or practices under this section. As alleged in more detail herein, at the time that Ford warranted and sold or leased the Class Vehicles, it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and Defendant improperly concealed

material facts regarding its Class Vehicles. Plaintiff and other Class members were therefore induced to purchase or lease the Class Vehicles under false pretenses.

212.   New York Class members had no way of knowing that Defendant's representations were false and misleading, and that the Class Vehicles suffered from the Bushing Defect.

213.   By the conduct described in detail above and incorporated herein, Ford engaged in unfair or deceptive acts in violation of the NY DAP. Defendant violated the NY DAP by, at minimum: (a) representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; (b) representing that Class Vehicles are of a particular standard, quality, and grade when they are not; (c) advertising Class Vehicles with the intent not to sell or lease them as advertised; and (d) representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

214.   Defendant intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead the New York Class.

215.   Defendant knew or should have known that their conduct violated the NY DAP.

216.   Defendant owed the New York Class a duty to disclose the true nature of the Class Vehicles, because Defendant:

(a)   possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised;

(b)   intentionally concealed the foregoing from Plaintiff, and/or Class members; and/or

(c)   made incomplete representations about the Class Vehicles generally, and the safety and reliability of the Class Vehicles, in particular, while purposefully withholding material facts from Plaintiff and the Class that contradicted these representations.

217.   Defendant's false and misleading statements about the Class Vehicles were material to Plaintiff and to the New York Class.

218.   Defendant's unfair or deceptive acts or practices were likely to and did, in fact, deceive reasonable consumers, including the New York Class members, about the safety, quality, and reliability of their Class Vehicles, and the true value of the Class Vehicles.

219.   Defendant's violations present a continuing risk to the New York Class, as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

220.   New York Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's misrepresentations and its

concealment of and failure to disclose material information. Defendant had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the NY DAP. All owners of Class Vehicles suffered ascertainable loss as a result of Defendant's deceptive and unfair acts and practices made in the course of Defendant's business.

221.   As a direct and proximate result of Defendant's violations of the NY DAP, New York Class members have suffered injury-in-fact and/or actual damage.

222.   As a result of the foregoing willful, knowing, and wrongful conduct of Defendant, New York Class members have been damaged in an amount to be proven at trial, and seek all just and proper remedies, including, but not limited to, actual damages or $50, whichever is greater, treble damages up to $1,000, punitive damages to the extent available under the law, reasonable attorneys' fees and costs, an Order enjoining Defendant's deceptive and unfair conduct, and all other just and appropriate relief available under the NY DAP.

223.   Plaintiff, on behalf of himself and the New York Class, seeks monetary damages, costs, attorneys' fees, and such other and further relief provided by law and equity.

**COUNT VI**

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**

(N.Y. U.C.C. LAW §§ 2-314 and 2-A-212)
(Individually and on behalf of the New York Class)

224.   Plaintiff Diaz ("Plaintiff," for purposes of the New York Class's claims) realleges and incorporates by reference all preceding allegations as though fully set forth herein.

225.   Plaintiff brings this claim individually and on behalf of the other members of the New York Class.

226.   Defendant is and was, at all relevant times, a "merchant" with respect to motor vehicles under N.Y. U.C.C. LAW § 2-104(1), and a "seller" of motor vehicles under N.Y. U.C.C. LAW § 2-103(1)(d).

227.   With respect to leases, Defendant is and was, at all relevant times, a "lessor" of motor vehicles under N.Y. U.C.C. LAW § 2-A-103(1)(p).

228.   The Class Vehicles are and were, at all relevant times, "[g]oods" within the meaning of N.Y. U.C.C. LAW §§ 2-105(1) and 2-A-103(1)(h).

229.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N.Y. U.C.C. LAW §§ 2-314(2)(c) and 2-A-212(2)(c). Ford knew or should have known of the specific use for which the Class Vehicles were purchased.

230.   The Class Vehicles, however, share a common defect in that they are all equipped with the Bushing Defect that makes the vehicles susceptible to rollaway or unexpected gear shifting, causing an unreasonable risk of serious bodily harm and property damage to lessees and owners of the Class Vehicles. This Bushing Defect renders the Class Vehicles, when sold or leased, and at all times thereafter, unmerchantable and unfit for their ordinary use of driving.

231.   The Class Vehicles are not fit for the purpose of providing safe and reliable transportation because of the Bushing Defect.

232.   Ford impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, *inter alia*, the following: (i) a warranty that the Class Vehicles manufactured, supplied, distributed, and/or sold by Ford were safe and reliable for providing transportation and would not prematurely and catastrophically fail; and (ii) a warranty that the Class Vehicles would be fit for their intended use – providing safe and reliable transportation – while the Class Vehicles were being operated.

233.   Contrary to the applicable implied warranties, the Class Vehicles, *viz.* their Defective Bushings, at the time of sale and thereafter were not fit for their ordinary and intended purpose. Instead, the Class Vehicles are defective, including, but not limited to, the Bushing Defect that makes the vehicles susceptible to rollaway

or unexpected gear shifting, causing an unreasonable risk of serious bodily harm and property damage to lessees and owners of the Class Vehicles.

234.   Ford was provided notice of the issues raised in this Count and this Complaint, as detailed above. Ford had actual knowledge of the Bushing Defect, and wrongfully and fraudulently concealed these material facts from Plaintiff and the New York Class. Ford was provided notice of these issues through, *inter alia*, the filing of this Complaint, warranty claims, customer complaints filed with NHTSA and posted online, and its own root cause investigations concerning the Bushing Defect before or within a reasonable amount of time after the allegations of the Bushing Defect became public. On November 21, 2022, Plaintiff, individually and on behalf of the Classes, also notified Ford of the Bushing Defect and the breach of warranty alleged herein through a notice letter. Notice of breach, however, is not required because Plaintiff and New York Class members did not purchase their automobiles directly from Ford.

235.   Plaintiff and the other New York Class Members have had sufficient direct dealings with Ford or its agents (*e.g.*, dealerships, Consumer Affairs departments, and technical support) to establish privity of contract between Ford on one hand, and Plaintiff and each of the other New York Class Members on the other hand. Nonetheless, privity is not required here because Plaintiff and each of the other Class Members are intended third-party beneficiaries of contracts between Ford and

their dealers, and specifically, of Defendant's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumers only. Additionally, privity is excused here because Plaintiff and each of the other Class members relied on statements made by Defendant itself in choosing to purchase or lease a Class Vehicle. As alleged herein, the marketing of the Class Vehicles was uniform, and was controlled and disseminated directly by Defendant.

236.   Ford's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use.

237.   As a direct and proximate result of Ford's breach of implied warranties of merchantability, Plaintiff and the other New York Class members are entitled to monetary damages in an amount to be determined at trial, costs, attorneys' fees, and such other and further relief provided by law and equity.

## COUNT VII
## VIOLATIONS OF THE MISSOURI MERCHANDISING PRACTICES ACT ("MMPA")

(MO. REV. STAT. § 407.010, ET SEQ.)
(Individually and on behalf of the Missouri Class)

238.   Plaintiff Connors ("Plaintiff," for purposes of the Missouri Class's claims) realleges and incorporates by reference all preceding allegations as though fully set forth herein.

239.   Plaintiff brings this claim individually and on behalf of the other members of the Missouri Class.

240.   The MMPA makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce." MO. REV. STAT. § 407.020.

241.   Ford, Plaintiff, and the Missouri Class members are "persons" within the meaning of MO. REV. STAT. § 407.010(5).

242.   Ford is engaged in "trade" or "commerce" in the State of Missouri within the meaning of MO. REV. STAT. § 407.010(7).

243.   By the conduct described in detail above and incorporated herein, Ford engaged in unfair or deceptive acts in violation of the MMPA. Plaintiff and the Missouri Class members suffered ascertainable loss as a direct and proximate result of Ford's unfair and deceptive acts and practices. Had Plaintiff and the Missouri Class members known that the Class Vehicles are defective, they would not have purchased or leased them, or would have paid significantly less for their Class Vehicles. Among other injuries, Plaintiff and the Missouri Class members overpaid for their Class Vehicles, and their Class Vehicles suffered a diminution in value.

244.   Ford is liable to Plaintiff and the Missouri Class for damages in amounts to be proven at trial, including attorneys' fees, costs, and punitive damages, as well as injunctive relief enjoining Ford's unfair and deceptive practices, and any other just and proper relief under MO. REV. STAT. § 407.025.

## COUNT VIII
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(MO. REV. STAT. § 400.2-314)
(On Behalf of the Missouri Class)

245.   Plaintiff Connors ("Plaintiff," for purposes of the Missouri Class's claims) realleges and incorporates by reference all preceding allegations as though fully set forth herein.

246.   Plaintiff brings this claim individually and on behalf of the other members of the Missouri Class.

247.   At all relevant times, Ford was the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles. Ford knew or should have known of the specific use for which the Class Vehicles were purchased.

248.   Ford provided Plaintiff and the Missouri Class Members with an implied warranty that the Class Vehicles, and any parts thereof, are merchantable and fit for the ordinary purposes for which they were sold. The Class Vehicles, however, share a common defect in that they are all equipped with the Bushing Defect that makes the vehicles susceptible to rollaway or unexpected gear shifting,

causing an unreasonable risk of serious bodily harm and property damage to lessees and owners of the Class Vehicles. This Bushing Defect renders the Class Vehicles, when sold or leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving.

249.   The Class Vehicles are not fit for the purpose of providing safe and reliable transportation because of the Bushing Defect.

250.   Ford impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, *inter alia*, the following: (i) a warranty that the Class Vehicles manufactured, supplied, distributed, and/or sold by Ford were safe and reliable for providing transportation and would not prematurely and catastrophically fail; and (ii) a warranty that the Class Vehicles would be fit for their intended use – providing safe and reliable transportation – while the Class Vehicles were being operated.

251.   Contrary to the applicable implied warranties, the Class Vehicles, *viz.* their Defective Bushings, at the time of sale and thereafter were not fit for their ordinary and intended purpose. Instead, the Class Vehicles are defective, including, but not limited to, the Bushing Defect that makes the vehicles susceptible to rollaway or unexpected gear shifting, causing an unreasonable risk of serious bodily harm and property damage to lessees and owners of the Class Vehicles.

252. Ford was provided notice of the issues raised in this Count and this Complaint, as detailed above. Ford had actual knowledge of the Bushing Defect, and wrongfully and fraudulently concealed these material facts from Plaintiff and the Missouri Class. Ford was provided notice of these issues through, *inter alia*, the filing of this Complaint, warranty claims, customer complaints filed with NHTSA and posted online, and its own root cause investigations concerning the Bushing Defect before or within a reasonable amount of time after the allegations of the Bushing Defect became public. On November 21, 2022, Plaintiff, individually and on behalf of the Classes, also notified Ford of the Bushing Defect and the breach of warranty alleged herein through a notice letter. Notice of breach, however, is not required because Plaintiff and Missouri Class members did not purchase their automobiles directly from Ford.

253. Plaintiff and the other Missouri Class Members have had sufficient direct dealings with Ford or its agents (*e.g.*, dealerships, Consumer Affairs departments, and technical support) to establish privity of contract between Ford on one hand, and Plaintiff and each of the other Missouri Class Members on the other hand. Nonetheless, privity is not required here because Plaintiff and each of the other Class Members are intended third-party beneficiaries of contracts between Ford and their dealers, and specifically, of Defendant's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights

under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumers only. Additionally, privity is excused here because Plaintiff and each of the other Class members relied on statements made by Defendant itself in choosing to purchase or lease a Class Vehicle. As alleged herein, the marketing of the Class Vehicles was uniform, and was controlled and disseminated directly by Defendant.

254.   Ford's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of MO. REV. STAT. § 400.2-314.

255.   As a direct and proximate result of Ford's breach of implied warranties of merchantability, Plaintiff and the other Missouri Class members are entitled to damages in an amount to be determined at trial.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Class, respectfully request that this Court:

a.     Certify this action as a class action, proper and maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure; declare that Plaintiffs are proper class representatives; and appoint Plaintiffs' counsel as Class Counsel;

b.     Grant appropriate injunctive and/or declaratory relief, including, without limitation, an order that requires Defendant to repair the Class Vehicles and

to extend the applicable warranties to a reasonable period of time, or, at a minimum, to provide Plaintiffs and Class members with appropriate curative notice regarding the existence and cause of the Bushing Defect;

      c.    Award Plaintiffs and Class members actual, compensatory, general, special, incidental, statutory, punitive, and consequential damages, costs, and disgorgement in an amount to be determined at trial;

      d.    Award to Plaintiffs the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

      e.    Award pre- and post-judgment interest at the maximum legal rate;

      f.    Grant leave to amend this Complaint to conform to the evidence produced in discovery and at trial; and

      g.    Grant all such other relief as is just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all claims so triable.

Dated: January 5, 2023

*/s/ E. Powell Miller*
E. Powell Miller (P39487)
Sharon S. Almonrode (P33938)
Dennis A. Lienhardt (P81118)
THE MILLER LAW FIRM, P.C.
950 W. University Dr., Suite 300
Rochester, MI 48073
Phone: 248.841.2200
Fax: 248.652.2852
epm@millerlawpc.com
ssa@millerlawpc.com
dal@millerlawpc.com

Elizabeth A. Fegan
FEGAN SCOTT LLC
150 S. Wacker Dr., 24th Floor
Chicago, IL 60606
Phone: 312.741.1019
Fax: 312.264.0100
beth@feganscott.com

Jonathan D. Lindenfeld
FEGAN SCOTT LLC
140 Broadway, 46th Floor
New York, NY 10005
Phone: 332.216.2101
Fax: 312.264.0100
jonathan@feganscott.com

ATTORNEYS FOR PLAINTIFFS AND
PROPOSED CLASS COUNSEL